Peter R. Afrasiabi (SBN 193336)
pafrasiabi@onellp.com
John Tehranian (Bar No. 211616)
jtehranian@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach, CA  92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

**BAY ADVOCACY PLLC**
Maximillian Amster (*Pro Hac Vice forthcoming*)
Samuel J Salario, Jr. (*Pro Hac Vice forthcoming*)
1700 S. MacDill Avenue, Suite 300
Tampa, Florida 33629

Attorneys for Plaintiff,
Hollywood Innovations Group, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HOLLYWOOD INNOVATIONS GROUP, LLC, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC., a Delaware corporation; ZIP CINEMA CO., LTD., a South Korea corporation; KAKAO ENTERTAINMENT CORP., a South Korea Corporation; PERSPECTIVE PICTURES CO., LTD.,a South Korea corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:21-cv-9423<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT**<br>**(17 U.S.C. § 501)**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Hollywood Innovations Group, LLC ("Plaintiff or "HIG") complains against Netflix, Inc. ("Netflix"), Zip Cinema Co., Ltd. ("Zip Cinema"), Kakao Entertainment Corp ("Kakao"), Perspective Pictures Co., Ltd. ("Perspective Pictures"), and DOES 1 through 10 (collectively, "Defendants"), as follows:

## INTRODUCTION

1. Once upon a time, Netflix was the innovative upstart, playing the role of "David" to Blockbuster Video's "Goliath." Netflix ultimately won that battle and, in the process, became a dominant force in video entertainment content production and distribution. Unfortunately, however, in its desperate quest to remain on top, Netflix has combined its power and innovation with unscrupulous business practices. This lawsuit, like other recent civil actions against the company, concerns these illicit activities.

2. Netflix identified the South Korean market as its next cash cow. But in its effort to grab valuable market share, it had to return to its innovative roots. Regrettably, it innovated in the most nefarious way – by weaponizing breakthroughs in language dubbing technology to steal content, repackage it as its own, and release the content to a massive global audience, thereby reaping tens of millions of dollars in ill-gotten profits along the way.

3. Plaintiff, Hollywood Innovation Group (HIG), was the victim of this carefully orchestrated campaign by Netflix and its partners to usurp HIG's valuable intellectual property rights for their unlawful commercial exploitation. Specifically, and among other things, HIG owns the exclusive rights to produce and market all versions, save Korean language, of a prescient original screenplay, *Devour*, written before the COVID-19 outbreak about one young man's struggle for survival during a global viral pandemic. In 2020, during the height of the COVID-19 crisis, a Korean-language motion picture, *#Saraidta*, based on the *Devour* screenplay became a blockbuster hit in South Korea. HIG was preparing to release an English language motion picture, *Alone*, that was based on the *Devour* screenplay, and

which featured A-list Hollywood talent and a renowned director. But Netflix, along with Korean producers, Zip Cinema and Perspective Pictures, beat HIG to the marketplace with an unauthorized and unlawful direct competitor to HIG's movie. Specifically, they used new language dubbing technologies to quickly and cheaply undermine HIG's rights by releasing, under the name *#Alive*, multiple dubbed versions (in numerous non-Korean languages, including English) of the original Korean title (*#Saraitda*) on Netflix. So, while Netflix and its partners profiteered handsomely from an illicit global streaming smash hit, HIG was left holding a worthless property.

4. Netflix has known for over a year that it did not own the rights to produce the content in question. It knew or was reckless in not knowing that it had no rights to distribute *Saraitda* dubbed into English or any other non-Korean language and that such new versions of *Saraitda* constituted unlawful derivative works. It knew or should have known it was breaking the law, committing flagrant copyright infringement. But that did not matter, apparently. Profits, market share and subscriber growth were deemed more important, leaving HIG with no choice but to litigate this matter.

## JURISDICTION AND VENUE

5. This is a civil action against Defendants for acts of copyright infringement under the Copyright Act, 17 U.S.C. §§ 101 *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 17 U.S.C. § 501(a), and 28 U.S.C. § 1338(a) and (b).

6. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(a) in that the claim arises in this judicial district and the injury suffered by Plaintiff took place in this judicial district. Defendants are subject to the general and specific personal jurisdiction of this Court because of their systematic contacts with, and purposeful availment of, the State of California.

Specifically, and among other things, Netflix is headquartered in Los Gatos, California and has a primary office in Los Angeles, California. Zip Cinema and Perspective Pictures, as alleged below, repeatedly reached out to Plaintiff in this forum seeking information about Plaintiff's movie production to further the infringement alleged herein. And on information and belief, Zip Cinema and Perspective Pictures regularly contract and do business in the State of California, including with corporations headquartered in the state. Each of the following Zip Cinema productions is distributed by Netflix, which is headquartered in Los Gatos, California: *Crazy Romance* (2019), *Golden Slumber* (2018), *Default* (2018), *The Priests* (2015), *Cold Eyes* (2013), *All About My Wife* (2012), and *Haunters* (2010). Moreover, certain of these films, such as *All About My Wife*, were released in theatres throughout North America, including Los Angeles. The Perspective Pictures productions *Night Moves* (2013) and *Martha Marcy May Marlene* (2011) were distributed by Fox Searchlight Pictures and Cinedigm, respectively, both of which are headquartered in Los Angeles, California. Furthermore, Perspective Pictures is, in its own words, "based in Los Angeles."[1]

## PARTIES

7.  Plaintiff Hollywood Innovations Group, LLC ("HIG") is a limited liability corporation existing under the laws of California, with its principal place of business in Los Angeles, California. HIG is a multi-service entertainment company, providing film production services domestically and abroad.

8.  Defendant Netflix, Inc. ("Netflix") is a corporation existing under the laws of Delaware, with its principal place of business in Los Gatos, California. Netflix is an American subscription-based streaming service offering a vast library of films and television programs for streaming to millions of subscribers across the world.

---

[1] See, e.g., https://www.perspective-us.com/company.

9. On information and belief, Defendant Zip Cinema Co., Ltd. ("Zip Cinema") is a corporation existing under the laws of South Korea, with its principal place of business in Seoul, South Korea. Zip Cinema is a leading Korean film production company, known for several popular titles in Korean cinema.

10. On information and belief, in a transaction announced in September 2021 and concluded thereafter, Zip Cinema was acquired by Defendant Kakao Entertainment Corp. ("Kakao"), a corporation existing under the laws of South Korea with its principal place of business in Seongnam, South Korea. Also on information and belief, as a result of the transaction, Kakao has succeeded to or otherwise become responsible for the liabilities of Zip Cinema and is thus responsible for Zip Cinema's acts of copyright infringement alleged herein.

11. On information and belief, Defendant Perspective Pictures Co., Ltd. ("Perspective Pictures") is a corporation existing under the laws of South Korea with offices in Los Angeles, California. Perspective Pictures is a film and television production company with several popular independent film titles under its name.

12. DOES 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint and insert the true names and capacities of said Defendants, individual or corporate, when the same have been ascertained in discovery. Plaintiff is informed and believes and, upon such, alleges that each of the Defendants designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein alleged, and that Plaintiff's damages as alleged herein were proximately caused by such Defendants.

## STATEMENT OF FACTS

### *Plaintiff's Copyright in the Script and Development of the Movie* Alone

13. Matt Naylor ("Naylor") is the author of an original screenplay entitled *Devour*, also known as *Alone* (the "Script"). Written before the COVID-19

pandemic, ironically, the Script details a young man's struggle for survival and the resulting mayhem as he is forced to self-isolate in his urban apartment during the outbreak of a global viral pandemic.  The Script was timely registered with the United States Copyright Office on June 3, 2019, under registration number TX0008796763.

14. Naylor was the sole and exclusive owner throughout the world of all rights, including copyrights, in and to the Script until July 18, 2018.

15. On July 18, 2018, Naylor entered into a license agreement with Zip Cinema and Perspective Pictures (the "Korean Producers"), granting them the carefully circumscribed right to produce just a "single, feature-length motion picture in the Korean language . . . based on the Original Script," (the "Korean Picture"), and the concomitant right to "exploit, exhibit, and distribute" said Korean language film (hereinafter the "Zip/Perspective License Agreement").  As such, all other rights to the Original Script remained with Naylor and, notably, the Zip/Perspective License Agreement did not convey any derivative rights to the Original Script to the Korean Producers. Moreover, to make matters even clearer, the parties expressly agreed and acknowledged that, among other things, Naylor specifically reserved the right to produce and distribute throughout the world an English language version of a movie based on the Script. *Id*.

16. Then, on April 1, 2019, Naylor entered into an agreement with Rabih Aridi ("Aridi"), granting and assigning Aridi all copyright interests and "all rights of every kind" in and to the Script (hereinafter the "Literary Purchase Agreement"). The only rights not conferred to Aridi were those limited rights expressly granted under the Zip/Perspective License Agreement (*i.e.,* the right to produce one Korean-language-only movie based on the Script), and live stage and publishing rights, the latter of which Naylor reserved for himself. *Id*. ¶¶1,2.  Each of the granted rights was freely assignable. *Id*. ¶ 12.

1       17.     On May 1, 2019, Aridi entered into an assignment agreement with Devour LLC, assigning to Devour LLC "all of [his] right, title and interest in and to the Literary Purchase Agreement."

        18.     On August 20, 2019, Devour LLC in turn granted to HIG, pursuant to an assignment agreement, "all right, title, and interest in and to" an English language movie based on the Script together with "all now or hereafter existing rights of every kind and character whatsoever therein, . . . including all . . . scripts. . . as well as all copies of any and all manuscripts thereof . . . and all versions and translations thereof."

        19.     As the owner of all rights to make the English language film based on the Script (and all derivative non-Korean language versions and other derivatives, also), and all derivative rights to the Script (including even derivative rights to any subsequent Korean versions, given the very limited grant of rights in the Zip/Perspective License Agreement grant), HIG undertook the production of an English language version film based upon the Script.

        20.     After exhaustive efforts, HIG was thrilled to secure the legendary Donald Sutherland and prominent young actor Tyler Posey in the two lead roles in the motion picture, to be named *Alone*. HIG also attached successful Hollywood auteur Johnny Martin to direct the film. This was something of a passion project for HIG and its team – an opportunity to realize a longtime dream of producing a commercially significant movie. Accordingly, it poured countless hours and significant financial resources into the production. With a poignant script, gripping story and A-list talent, HIG had every reason to believe that *Alone* would enjoy great box office success, a view that would only be further bolstered by the resonance of the work after the outbreak of the global COVID pandemic in early 2020. HIG began production of *Alone* in 2019 and had plans for an official release in October 2020.

21. Besides a standard box office release, HIG had its own streaming plans in place and had intended to strike a deal with Netflix, which had done prior deals with Johnny Martin and HIG principals. HIG had every reason to be optimistic about *Alone's* prospects, as the film featured a star-studded cast and significant, positive support from potential distributors, all owing largely to the fortuitous timing of the film's subject matter given the COVID pandemic and the related lockdowns that had struck the world in early 2020.

***Defendants' Infringing Activities and the Resulting Damage to Plaintiff***

22. While HIG was producing its English language version of the film in the United States, Zip Cinema and Perspective Pictures produced in South Korea their Korean language film, named *#Saraitda* (later named *#Alive* on Netflix), based on the Script. Released in South Korea in June 2020, at the height of the COVID-19 pandemic, *#Saraitda* was a major box office success in the country, enjoying the highest first-day viewership of any film since the start of the pandemic, dominating 62% of the box office, surpassing two million people in theatrical admissions and grossing nearly $15 million in theatrical revenues despite the global downturn in box office revenues as audiences avoided indoor public venues that put them at risk for COVID.

23. Following *#Saraitda*'s theatrical success in Korea, Naylor—now purportedly acting on behalf of the Korean Producers—contacted HIG to discuss the potential acquisition of sequel and other derivative rights by Zip Cinema and Perspective Pictures. To facilitate discussions, the Korean Producers again made clear, and verified, that the right to produce an English language version of the film would remain excluded from any future agreement, just as it had been with the prior agreement they had with Naylor. The foregoing correspondence dispels any doubt that the Korean Producers clearly understood that their rights under the Zip/Perspective License Agreement excluded the right to produce or distribute an

1  English language version of a film based on the Script (let alone more derivative
2  versions in Korean, whether movie sequels or episodic series), thereby rendering
3  their conduct particularly egregious and willful.
4      24.   During HIG's production of *Alone* in 2019-20, the Korean Producers,
5  who were in the midst of making their Korean language film under their limited
6  grant of rights, repeatedly emailed and called the director and producers of *Alone* in
7  California to ascertain various details about the American production, including its
8  timeline.  The calls seemed curious and irrelevant at the time since each entity was
9  making a film in entirely different markets (Korean language for the Korean
10 Producers and English/all other languages for HIG).  However, the subterfuge at
11 play is now clear: the Korean Producers had duplicitously intended to race to
12 complete their Korean film and then unlawfully dub it into English and other
13 languages to reach a more lucrative market and maximize their profits.  And, to take
14 full advantage of this tantalizingly rewarding, albeit thoroughly illicit, opportunity,
15 the Korean Producers would need to get their dubbed and subtitled version of *#Alive*
16 to market prior to the completion of HIG's movie production and its release of
17 *Alone* in domestic and foreign cinemas and on streaming services.
18     25.   With the global outbreak of the COVID pandemic, the economic
19 incentive for the Korean Producers' malfeasance increased dramatically.  HIG and
20 the Korean Producers sat on motion pictures that had a remarkable and unique
21 resonance with what people around the globe were experiencing in their real lives.
22 Audiences were hungry for content that spoke to the struggles they were facing
23 during the COVID lockdown.  But the rights that the Korean Producers had secured
24 (again, for just a single Korean-language-only film based on Naylor's Script)
25 reached only a small fraction of the audience compared to the rights that HIG had
26 secured (for, among other things, the English language film based on the Script, any
27 non-Korean language movies based on the Script, and all derivative rights to the
28

1. Script, including but not limited to derivative rights to any Korean-language sequel movies).

26. Putting the lure of profits over the law and using information they had obtained about the *Alone* production under false pretenses, the Korean Producers carefully timed their dubbed and subtitled version of #Alive to hit the international streaming marketplace, through Netflix, in advance of the release of *Alone*, thereby reaping tens of millions of dollars in ill-gotten gains and utterly annihilating the marketplace for *Alone* in the process.

27. Among other things, Zip Cinema's and Perspective Pictures' intentional and directed contacts were made into this forum in an attempt to glean as much information as possible to aid them in their race to unlawfully beat HIG to the lucrative English language and streaming markets with their infringing work, thereby underscoring the wanton and willful nature of their illicit activities.

28. Recognizing *#Saraitda*'s potential for success in other markets, Netflix ostensibly acquired international distribution rights in the Korean language film pursuant to a license agreement with an entity named Lotte Entertainment, which had acquired whatever rights the Korean Producers possessed and was working in concert and privity with said Korean Producers.

29. Indeed, Netflix has made a major push in recent years to release foreign films dubbed into English by taking advantage of modern dubbing techniques and technologies that Netflix itself recognizes are an "art" form. These new techniques enable foreign films to reach wide English-speaking audiences who would, in prior decades, largely eschew foreign movies due to the undesirability of reading subtitles and the poor quality of dubbing that made such movies difficult to watch in the past. As a result of the availability of these new dubbing practices, Netflix has taken foreign movies which would have previously only enjoyed niche art-house audiences and, by creating derivative versions of these works dubbed in the local languages of numerous markets, made them widely accessible to a global audience.

For example, the English language version of the Korean series *Squid Game*, which is dubbed in English (among other languages) on Netflix, has become a viral sensation and quickly skyrocketed to the top of Netflix's all-time most-watched titles—a list that also includes the English language version of the Spanish show *Money Heist* and the English language version of the French show *Lupin*, each of which have benefited from the creative dubbing improvements of the past few years.

30. Netflix's business model has relied heavily on Korean content due to its profitability, given South Korea's unique position as a cultural hub of and barometer for success in the broader Asian marketplace. As a result, Netflix has invested heavily in South Korean content (to the tune of $500 million this year alone). As Ted Sarandos, Netflix's co-Chief Executive Officer and Chief Content Officer, has noted, "Over the last two years, we've seen the world falling in love with the incredible Korean content."[2] Thus, the lure of profits and increasing its profile as the leading outlet for Korean content motivated Netflix's eager willingness to weaponize new dubbing technologies to exploit content from South Korea in the absence of appropriate licenses, even when put on specific legal notice thereof by HIG's counsel.

31. While Sarandos has trumpeted the tagline, "Made in Korea and watched by the world on Netflix,"[3] the facts of this case suggest a more appropriate epigram: "Made in Korea and infringed for the world on Netflix."

32. On September 8, 2020, after it had already been previously released in South Korea by the Korean Producers, Netflix released *#Saraitda* as *#Alive* on its streaming platform. Drawing on Netflix's dubbing prowess, Netflix and the Korean Producers created a high-quality dubbed and subtitled version of *#Alive* in English,

---

[2] Lucas Shaw & Ziaoying Zhao, *Netflix Plans $500 Million Spending in Korea to Crack Asia*, BLOOMBERG | QUINT (Feb. 24, 2021), https://www.bloombergquint.com/onweb/netflix-plans-500-million-korea-budget-this-year-to-crack-asia.
[3] *Id.*

11
**COMPLAINT**

1 | as well as high-quality dubbed and subtitled versions in an additional 30 languages
2 | for release on Netflix's streaming platform during the COVID-19 pandemic.

33. *#Alive* was an instant international sensation and massive hit for Netflix. Two days after its release, the film achieved a first place ranking on the global platform.[4] By December 2020, *#Alive* was on the top ten list in some 90 different countries, including the United States, making it one of the most popular titles globally on Netflix that year and, in fact, ever.[5]

34. Johnny Martin and HIG were shocked at the release of *#Alive*. Martin, who had known Matt Naylor for many years, immediately called Naylor, who had been interfacing with the Korean Producers, to discuss this illicit English release of the film based upon the Script and attempt to resolve the situation before being forced to involve legal counsel. Naylor did not answer and ignored Martin's voicemail.

35. Predictably, Netflix's release of *#Alive* devastated the market for *Alone* and its October 2020 release. By the time *Alone* premiered, audiences around the world had already streamed *#Alive* – with its virtually identical plotline – in English (and 30 other non-Korean languages)*,* rendering *Alone* commercially unviable with a massive lost opportunity to monetize the value of the now-produced film. This is to say nothing of the years of passion, work, and resources HIG had poured into the project, which were now all for naught.

36. Adding insult to injury, critics and audiences alike have incorrectly derided *Alone* as knock-off of *#Alive*. All told, the illicit release of *#Alive* in English thoroughly undermined the ability of HIG to secure attention and support for its film, costing HIG millions of dollars in damages for its own English-language film at a peak moment in terms of its resonance with audiences worldwide during the

---

[4] Kwak Yeon-soo, *Zombie Thriller "#Alive" Becomes Netflix's Most Popular Film*, KOREA TIMES (Sept. 11, 2020), https://www.koreatimes.co.kr/www/art/2020/09/689_295880.html.
[5] *The Stories That Helped Us Escape At* Home, NETFLIX (Dec. 10, 2020), https://about.netflix.com/en/news/what-we-watched-2020-on-netflix

1 COVID pandemic. In addition, Defendants' actions have also squelched the
2 possibility of a sequel to *Alone*, on which HIG had actively been working. Indeed,
3 HIG had already prepared parts of a sequel script, including the ending, and it had
4 engaged in preliminary discussions with Lionsgate regarding the sequel's
5 production and distribution.

6     37. Moreover, due to Netflix's release of new versions of *#Alive* in other
7 non-Korean languages (*e.g.*, French, Spanish, German, Russian, etc.), HIG was
8 deprived of its contracted-for ability to create additional derivative works by
9 dubbing and releasing *Alone* into other languages and, as such, lost significant
10 foreign business opportunities to release *Alone* worldwide in non-English languages
11 (other than Korean) as the actions of Defendants desiccated those markets.

12     38. On September 18, 2020, counsel for HIG sent a letter to Netflix
13 demanding the immediate takedown of the film's dubbed versions from its
14 streaming platform. Netflix refused and continued streaming and marketing *#Alive*.

15     39. On September 21, 2020, counsel for HIG also sent Zip Cinema a letter
16 demanding that it immediately instruct Netflix to remove *#Alive* from its streaming
17 platform and permanently cease and desist all unauthorized dubbing and subtitling
18 of the film and distribution of such translations. Zip Cinema was also notified that
19 *Alone* would be premiering domestically in early October 2020, making it
20 imperative that Defendants immediately halt their infringing activities. Zip Cinema
21 ignored these requests.

22     40. As sophisticated and established global players in the motion picture
23 industry, Defendants are deeply steeped in the world of intellectual property, have
24 full knowledge of the strictures of intellectual property law, vigorously enforce their
25 own intellectual property rights, and understand the basic requirements for licensing
26 the use of copyrighted content for commercial exploitation. Yet, notably, in
27 response to the above-mentioned demand letters, neither Netflix nor Zip Cinema
28 offered any other agreement predating the Literary Purchase Agreement that would

justify any claim to superior rights or provided any viable factual or legal basis upon which to justify their conduct, thereby further establishing the brazen nature of Defendants' infringing conduct, which continues unabated to this day.

41. The wanton and willful infringing acts of Defendants have translated into substantial ill-gotten commercial advantage. Netflix has generated considerable profits and value from its unlawful distribution of the derivative versions of the Korean Picture in English and other languages. On information and belief, based on publicly disclosed viewership figures for comparable Netflix releases, *#Alive* likely received between 40 and 60 million views, translating to tens of millions of dollars of value for Netflix alone. Furthermore, to the extent that Netflix's release of *#Alive* and its dubbed versions translated into new subscribers for the company, HIG is entitled to that portion of Netflix's monthly subscriber revenue generated by Defendants' conduct.

42. The exact number of views *#Alive* received on Netflix, both organic and as generated by social media links to drive traffic, and the potential subscriber-base value Netflix secured due to the film are unknown to Plaintiff but are known to Netflix and will be the subject of discovery.

43. Defendants' infringement continues to date, as *#Alive* remains available for streaming by audiences across the world on Netflix. To make matters even worse, Korean Producers are planning a forthcoming television series based on *#Alive* and, upon information and belief, Netflix is also involved in the unlawful project.

**FIRST CLAIM FOR RELIEF**

**(Copyright Infringement, 17 U.S.C. § 501, against all Defendants)**

44. Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 43 above.

45. Plaintiff is the rightsholder to the relevant copyrights in and to the Script and Film, which substantially consist of wholly original material that

1 constitutes copyrightable subject matter under the laws of the United States. Plaintiff has complied in all respects with the Copyright Act and all the laws of the United States governing copyrights, and the Script and Film were both timely registered with the U.S. Copyright Office (the Film *Alone* under Registration Certificate Number PA0002248290, and the Script *Devour* as alleged above under Registration Number TX0008796763).

46. Defendants have directly, contributorily and/or vicariously infringed, and, unless enjoined, will continue to infringe Plaintiff's copyrights in the Script and Film by preparing, reproducing, publicly displaying and exhibiting, and distributing derivative works in myriad languages based on the Script for purposes of trade in violation of 17 U.S.C. § 501 *et seq*.

47. Defendants have also knowingly induced, caused, or materially contributed to the infringing conduct of third parties and/or have obtained a direct financial benefit therefrom while possessing the right and ability to control the infringing conduct of third parties.

48. Defendants' actions are and have been willful and in wanton disregard of Plaintiff's rights.

49. Defendants have received substantial benefits in connection with the unauthorized preparation, reproduction, public display and exhibition, and distribution of unauthorized derivative works in myriad languages based on the Script for purposes of trade.

50. The actions of Defendants were, and are continuing to be, performed without the permission, license, or consent of Plaintiff.

51. The wrongful acts of Defendants have caused, and are causing, great injury to Plaintiff, including but not limited to substantial damages to its business in the form of diversion of trade, loss of profits, injury to goodwill and reputation, and the dilution of the value of its rights, all of which are not yet fully ascertainable. Netflix's global distribution of *#Alive* deprived Plaintiff of the profit it expected to

earn globally from its release of *Alone*. Given the tens of millions of dollars generated by *#Alive* at just the Korean box office and the fact that *Alone*, unlike *#Alive*, featured acclaimed actors, such as Donald Sutherland, but-for Defendants' infringing acts, *Alone* would have undoubtedly generated far more in profits due to the staggering differences in size between the South Korea and United States film markets. Furthermore, Netflix has earned tens of millions of dollars in profits from its unlawful reproduction, public display, exhibition, and distribution of *#Alive* in its dubbed and subtitled incarnations.

52. Defendants' infringing acts continue to date unabated despite notice and, unless this Court restrains Defendants from further commission of said acts, Plaintiff will suffer irreparable injury, for all of which it is without an adequate remedy at law. Accordingly, Plaintiff seeks a declaration that Defendants are infringing its copyrights and an order under 17 U.S.C. § 502 enjoining Defendants from any further infringement of its copyrights.

53. Plaintiff is entitled to injunctive relief, actual and statutory damages in an amount to be proven at trial for the infringement detailed above. Plaintiff is also entitled to its attorneys' fees in prosecuting this action under 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1. For an order permanently enjoining Defendants, its officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, be permanently enjoined from copying, reproducing, exhibiting, displaying, promoting, advertising, distributing, or selling, or any other form of dealing or transaction in or exploitation of, any and all dubbed or subtitled versions of *#Alive*, as well as any and all other unauthorized derivative works, including, but not limited to, further dubbing, episodic series, sequels of any kind, or

other works in other formats, based on the Script, which directly, contributorily and/or vicariously infringe Plaintiff's rights in the Script and Film.

2. For actual damages due to Defendants' acts of copyright infringement and to make Plaintiff whole for all damages and losses suffered by Plaintiff by reason of Defendants' acts, pursuant to 17 U.S.C. § 504 (a)(1) & (b).

3. For an accounting and payment to Plaintiff of all profits, income, receipts, or other benefit derived by Defendants from the reproduction, copying, display and exhibition, promotion, distribution or sale of products and services, or other media, either now known or hereafter devised, that improperly or unlawfully infringe upon Plaintiff's copyrights pursuant to 17 U.S.C. §§ 504 (a)(1) & (b).

4. For statutory damages under 17 U.S.C. § 504(a)(2), (c).

5. For costs, attorneys' fees, and interest under 17 U.S.C. § 505.

6. For any such other and further relief as the Court may deem appropriate and just.

Dated: December 6, 2021

By: /s/ Peter R. Afrasiabi
Peter R. Afrasiabi, Esq.
John Tehranian, Esq.
**ONE LLP**

Maximillian Amster
Samuel J Salario Jr., Esq.
**BAY ADVOCACY PLLC**

Attorneys for Plaintiff,
Hollywood Innovations Group, LLC

# DEMAND FOR JURY TRIAL

Plaintiff Hollywood Innovations Group, LLC, hereby demands trial by jury of all issues so triable under the law.

Dated: December 6, 2021

By: /s/ Peter R. Afrasiabi
Peter R. Afrasiabi, Esq.
John Tehranian, Esq.
**ONE LLP**

Maximillian Amster
Samuel J Salario Jr., Esq.
**BAY ADVOCACY PLLC**

Attorneys for Plaintiff,
Hollywood Innovations Group, LLC