Peter R. Afrasiabi (SBN 193336)
pafrasiabi@onellp.com
John Tehranian (Bar No. 211616)
jtehranian@onellp.com
**ONE LLP**
23 Corporate Plaza
Suite 150-105
Newport Beach, CA  92660
Telephone: (949) 502-2870
Facsimile: (949) 258-5081

**BAY ADVOCACY PLLC**
Maximillian Amster (*Pro Hac Vice*)
Samuel J Salario, Jr. *(Pro Hac Vice)*
1700 S. MacDill Avenue, Suite 300
Tampa, Florida 33629

Attorneys for Plaintiff,
Hollywood Innovations Group, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HOLLYWOOD INNOVATIONS GROUP, LLC, a California corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>NETFLIX, INC., a Delaware corporation; ZIP CINEMA CO., LTD., a South Korea corporation; PERSPECTIVE PICTURES CO., LTD.,a South Korea corporation; and DOES 1-10, inclusive,<br><br>    Defendants. | Case No. 2:21-cv-09423-AB(GJSx)<br>Hon. Andre Birotte, Jr<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO DEFENDANT NETFLIX, INC.'S MOTION TO DISMISS COMPLAINT (REDACTED)**<br><br>Hearing Date: March 25, 2022<br>Time:          10:00 a.m.<br>Location:     Courtroom 7B |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................... 1

II.   ALLEGATIONS OF THE COMPLAINT ............................................ 2

    A.   The Script and Aridi's Acquisition of Exclusive Rights Thereto. .......... 2

    B.   HIG Acquires Aridi's Rights and Begins Production of *Alone*. .............. 3

    C.   Netflix Releases Dubbed and Subtitled Versions of *#Saraidta*, Willfully Infringing HIG's Copyright in the Process. ............................................ 4

III.  ARGUMENT ......................................................................................... 5

    A.   The Complaint Plausibly Alleges Copyright Infringement. .................... 5

        1.   The Complaint plausibly alleges Netflix's distribution of dubbed and subtitled versions of #Saraitda infringes HIG's exclusive rights. ...................................................................................... 5

        2.   Netflix's Korean-law arguments based on the Naylor-Zip Agreement are meritless. ................................................. 7

            a.   Korean law does not apply to HIG's Complaint. ............... 8

            b.   Even if the Korean Copyright Act applies, Netflix has failed to show it would defeat HIG's claims as a matter of law. ................................................................................. 9

            c.   The Netflix-Zip Agreement expressly stipulates that Naylor did not transfer the right to translate *#Saraitda*. .... 9

            d.   Any translation rights do not extend to versions of *#Saraitda* that were dubbed and subtitled in English. ..... 13

            e.   Any translation rights do not extend to dubbed versions of *#Saraitda*. ........................................................................ 14

        3.   The Complaint plausibly alleges that HIG has standing. ........... 15

    B.   The Court Should Not Dismiss for Forum Non Conveniens. ............... 17

    C.   Dismissal Under Rule 19 Is Improper. .................................................. 21

    D.   Plaintiff Requests Leave to Amend. ...................................................... 25

IV.  CONCLUSION ................................................................................... 25

ii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT NETFLIX INC.'S MOTION TO DISMISS COMPLAINT**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Arkeyo, LLC v. Saggezza, Inc.*,
    2021 WL 2254959, *9–10 (N.D. Ill., June 3, 2021)...............................21

*Bassett v. Mashantucket Pequot Tribe*,
    204 F.3d 343, 360 (2d Cir. 2000) ........................................................22

*Bekins v. Zhelznyak*,
    2016 WL 126729, at *2 (C.D. Cal. Jan. 11, 2016) ...............................21

*Carijano v. Occidental Petrol. Corp.*,
    643 F.3d 1216, 1227 (9th Cir. 2011) ..............................................17, 18

*Cooper v. Tokyo Elec. Power Co.*,
    860 F.3d 1193, 1210 (9th Cir. 2017) ..............................................17, 20

*Costello Pub. Co. v. Rotelle*,
    670 F.2d 1035 (D.C. Cir. 1981).......................................................21, 22

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*,
    276 F.3d 1150 (9th Cir. 2002) .............................................................22

*de Fontbrune v. Wofsy*,
    838 F.3d 992, 1000 (9th Cir. 2016) .................................................10, 19

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.*,
    375 F.3d 861, 879–80 (9th Cir. 2004) ............................................21, 23

*DSFB Kollective Co. Ltd. v. CJ E & M Am., Inc.*,
    2015 WL 12781211 (C.D. Cal. June 4, 2015).......................................20

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048, 1051 (9th Cir. 2003) ....................................................25

*Gates Learjet Corp. v. Jensen*,
    743 F.2d 1325, 1446 (9th Cir. 1984) ....................................................19

ii

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT NETFLIX INC.'S MOTION TO DISMISS COMPLAINT**

*Gilliam v. ABC*,

    538 F.2d 14, 25 (2d Cir. 1976) ...................................................................22, 24

*Joe Hand Promotions, Inc. v. Bragg*,

    2014 WL 2589242, *9 (S.D. Cal., June 10, 2014) ......................................23

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,

    922 F.3d 946, 951 (9th Cir. 2019) ..................................................................5

*Nat'l Ctr. For Jewish Film v. Riverside Films LLC*,

    2012 WL 4052111, at *3 (C.D. Cal., Sept. 14, 2012) ..........................14

*Ravelo Monegro v. Rosa*,

    211 F.3d 509, 514 (9th Cir. 2000) ................................................................16

*Salton, Inc. v. Philips Domestic App. & Per. Care*,

    391 F.3d 871, 877 (7th Cir. 2004) ................................................................21

*So v. Land Base, LLC*,

    2009 WL 5088745, at *3 (C.D. Cal. Dec 16, 2009)...................................8

*Temple v. Synthes Corp.*,

    498 U.S. 5, 7 (1990)......................................................................................21

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,

    692 F.3d 1009, 1016 (9th Cir. 2012) ............................................................6

*U.S. Small Bus. Admin. v. Rocket Ventures II, L.P.*,

    2013 WL 57854, at *6 (N.D. Cal. Jan. 3, 2013)....................................17

*Unicolors, Inc. v. Urban Outfitters, Inc.*,

    853 F.3d 980, 990 (9th Cir. 2017) ................................................................6

*United States v. 10th Century Cambodian Sandstone Sculpture*,

    2013 WL 1290515, at *8 (S.D.N.Y March 28, 2013) ..........................9

**STATUTES**

17 U.S.C. § 101................................................................................................5, 6, 7

17 U.S.C. § 102..............................................................................................................23

17 U.S.C. §§ 106(1)–(4) ..............................................................................................5

Fed. R. Civ. P. 15(a)(2) .................................................................................25

Fed. R. Civ. P. 19(b) ...................................................................................24

OTHER AUTHORITIES

Merriam-Webster ...................................................................................6, 10

TREATISES

2 NIMMER ON COPYRIGHT § 8.09[A][1] .........................................................7

3 NIMMER ON COPYRIGHT § 12.03 .............................................................23

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1614 (3d ed. 1998) ......21

INTERNATIONAL LAW

Berne Convention for the Protection of Literary and Artistic Works art. 5(2),

    Sept. 28, 1979 ....................................................................................9

FOREIGN LAW

Jeojaggwonbeob [Copyright Act] art. 5 para. 1 (S. Kor.) ...................................10, 16

## I.    INTRODUCTION

The motion to dismiss should be denied because the Complaint plausibly states a copyright infringement claim, there is no basis in evidence or common sense for a *forum non conveniens* dismissal, and a dismissal for failure to join indispensable parties would be error under black-letter law.

This case centers on a screenplay (the "Script") for a movie written by a screenwriter named Matt Naylor. ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████ Apart from being able to make one Korean-language movie, Aridi owned worldwide rights in all languages. He later transferred them to Plaintiff Hollywood Innovations Group, LLC ("HIG").

Zip and Perspective made a Korean movie called *#Saraidta*, which was a Korean box office hit. Meanwhile, HIG worked on a movie in English called *Alone*. But before *Alone* was released, Netflix, Zip, and Perspective hatched a plan for Netflix to produce new versions of *#Saraidta* dubbed and subtitled into English and 30 other languages. These new versions, made with sophisticated dubbing technology by different voice actors speaking English and other languages, ████████ ████████████████████ They were separate derivative works. And Netflix's thus violated HIG's copyright and destroyed *Alone's* prospects for success. There is no reason to dismiss HIG's Complaint.

*First,* the Complaint states a claim for copyright infringement. Taking its allegations as true and construing them in HIG's favor, it plausibly alleges that two bundles of rights were implicated by *#Alive*: the rights to the dialog and other elements contributed by the Script and exclusively owned by HIG the rights to new elements added by the movie, such as performances and visual effects, owned by

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT NETFLIX INC.'S MOTION TO DISMISS COMPLAINT

1    Zip and Perspective.  Netflix willfully decided to distribute *#Alive* without clearing

2    the rights to the former with HIG and thus infringed HIG's copyright.

3         *Second*, Netflix has not come close to carrying its "heavy burden" of proving

4    that litigation in this Court is oppressive and vexatious out of all proportion to HIG's

5    convenience.  The case concerns the infringement of U.S.-registered copyright

6    under U.S. copyright law.  HIG and Netflix are located in California, and, as shown

7    in the accompanying Aridi Declaration, most of the material witnesses and

8    documents are too.  Netflix has not produced a shred of evidence to show that Korea

9    is a better forum.

10        *Third*, neither Zip, Perspective, nor anyone else is a necessary or

11   indispensable party.  Liability for copyright infringement is joint and several.  It is

12   hornbook law that joint and several liability means that a plaintiff may proceed

13   against some, all, or even just one person in the chain of distribution of an infringing

14   work.  Rule 19 does not apply here.

15   **II.   ALLEGATIONS OF THE COMPLAINT**

16        **A.   The Script and Aridi's Acquisition of Exclusive Rights Thereto.**

17        This case centers on an original screenplay for a movie titled *Devour* a/k/a

18   *Alone* (the "Script") by California-based screenwriter Matt Naylor, the exclusive

19   owner of all rights therein. Compl. ¶ 3, 13, 14. ███████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ██████████████████████████████████████████████

26   ██████████████████████████████████

27        Naylor's complete assignment to Aridi excluded only one thing: ███████████

28   ████████████████████████████████████████████████

1   ████████████████████████████████████████████

2   ████████████████████   The Naylor-Zip Agreement gave the Korean producers

3   only one thing: ████████████████████████████████

4   ████████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████

8        Thus, Zip and Perspective received only the right to make one movie in

9   Korean. ████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████

14     ████████████████████████████████████

15     ████████████████████████████████████

16     ████████████████████████████████████

17     ████████████████████████████████████

18     ████████████████████████████████████

19     ████████████████████████████████████

20     ████████████████████████████████████

21     ████████████████████

22  *Id.*  Thus, ████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████

25        **B.    HIG Acquires Aridi's Rights and Begins Production of *Alone.***

26        Aridi assigned "all of [his] right, title, and interest in and to" the Naylor-Aridi

27  Agreement to Devour LLC, who then assigned these rights to HIG. Compl. ¶¶ 13,

28  17, 18. HIG thus owns the entire copyright in the Script—which is registered with

the U.S. Copyright Office—with the exception of the right to make a single movie in Korean.  With its broad rights in the Script, HIG set about making *Alone*, its own production in English. *Id.* ¶¶ 13, 19–20. With Hollywood director Johnny Martin attached to direct, and Donald Sutherland and Tyler Posey in the two lead roles, HIG planned for an official release in October 2020, with plans for streaming deals and sequels.  *Id.* ¶¶ 20–21, 36.

Strange coincidences occurred during production, however.  First, agents of Zip and Perspective, who were making the Korean-language movie Naylor licensed them to make, kept calling and emailing *Alone* producers to ascertain details about its production. Compl. ¶ 24. The Korean movie, called *#Saraidta*, was released in Korea in June 2020, and quickly became a hit, which raised no concerns since the movie was intended for consumption only in the Korean language. *See id.* ¶¶ 23–24. After the successful release of *#Saraidta* in Korea, Naylor contacted HIG on behalf of Zip and Perspective about potentially acquiring sequel and other derivative rights to the Script, indicating their clear understanding that they did not have that or any other derivative rights to the Script. *Id.* ¶ 23.

## C. Netflix Releases Dubbed and Subtitled Versions of *#Saraidta*, Willfully Infringing HIG's Copyright in the Process.

The reason for the whirlwind inquiries later became clear. While HIG was making *Alone*, Netflix, Zip and Perspective quietly arranged a deal where Netflix (ostensibly via rights from an intermediary named Lotte Entertainment) would produce versions of *#Saraidta* dubbed and subtitled into other languages, all without acquiring clearance from HIG.  *See* Compl. ¶¶ 26–28. On September 8, 2020, Netflix released *#Saraidta* under the English name *#Alive* dubbed and subtitled from Korean into English and 30 other languages. *Id.* ¶ 32.  With newly recorded dialog by different actors in different languages enhanced by sophisticated dubbing techniques developed by Netflix, viewers of *#Alive* were treated to a much more

1  realistic product than film dubbing has ever provided before.[1] *See id.* ¶¶ 2–3, 29.

2      When people watched the English-language *#Alive*, they watched a movie

3  with an English name in which the dialog was performed in English by English-

4  speaking actors.  So, when HIG released *Alone* in October 2020, *#Alive* had been

5  widely viewed and *Alone*, derided as a knock-off*,* saw its commercial prospects in

6  the U.S. and with foreign audiences destroyed.  *Id.* ¶¶ 34–36. This copyright

7  infringement action followed.  *See id.* ¶¶ 8–11.

## III.    ARGUMENT

### A.    The Complaint Plausibly Alleges Copyright Infringement.

10      To state a claim for infringement, HIG need only allege facts—when assumed

11  true and all inferences are made in its favor—to plausibly show Netflix infringed an

12  exclusive right under section 106 of the Copyright Act*. See Malibu Textiles, Inc. v.*

13  *Label Lane Int'l, Inc.*, 922 F.3d 946, 951 (9th Cir. 2019) HIG has done that.

#### 1.    The Complaint plausibly alleges Netflix's distribution of dubbed and subtitled versions of #Saraitda infringes HIG's exclusive rights.

17      Under Section 106, HIG's ownership of the copyright to the Script granted it

18  exclusive rights "to prepare derivative works based on" the Script and to reproduce,

19  distribute and publicly perform copies thereof. 17 U.S.C. §§ 106(1)–(4) The

20  Complaint plausibly alleges that Netflix has infringed all of these rights.

21      ***The exclusive right to produce derivative works.***  Netflix's dubbed and

22  subtitled versions of *#Saraitda* are "derivative works" that HIG had the exclusive

23  right to prepare. A "derivative work" is a "work based upon one or more preexisting

24  works" and includes any "translation" and "any other form in which a work may be

25  recast, transformed, or adapted." In the moviemaking context, "[a] motion picture is

---

[1] The dubbing process involves replacing the dialog in an original movie with new dialog performed by actors speaking languages other than the language in which the original film was made.  *See Dubbed*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dubbing (last visited Feb. 23, 2022); Joshua M. Daniels, *Lost in Translation: Anime, Moral Rights, and Market Failure*, 88 B.U.L. Rev. 709, 713 (2008).

a derivative work; the motion picture screenplay is one of the preexisting works." *Malijack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1420 (C.D. Cal. 1997), *aff'd* 160 F.3d 1223 (9th Cir. 1998). The Complaint plausibly alleges that the dubbed and subtitled versions of *#Saraitda* were "based upon" the "preexisting work" of the Script, as a script is literally the source of the words spoken in a movie. *See Script*, Merriam-Webster, https://www.merriam-webster.com/dictionary/script ("the written text of a stage play, screenplay, or broadcast *specifically*: the one used in production or performance."). Indeed, Netflix's assertion that dubbed/subtitled versions of *#Saraitda* are "translations"[2] of the movie, Motion to Dismiss ("MTD") 8:8–9, confirms that those versions are derivative of the Script, as translations are literally the first category of derivative work listed in the Copyright Act.  *See* 17 U.S.C. § 101. These "translations" of *#Saraitda* are thus "based upon" the Script from which which the translated content came. *See Translation*, Merriam-Webster https://www.merriam-webster.com/dictionary/translation (defining translation as "a rendering from one language into another").

Netflix's argument that the dubbed/subtitled versions of *#Saraitda* are derivative of only the original Korean-language version and not the Script is wrong for two reasons.  First, "the author of [a] source work retains all rights and copyright protections in the source work independent of . . . any derivative works" such that rights that attach to a derivative work are "limited to the changes and contributions made by the derivative work's author." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 990 (9th Cir. 2017) *see also U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012). So, if someone makes an unauthorized version of the classic James Bond movie *Dr. No*, it is not only the studio that owns the rights to the *Dr. No* movie who could sue for infringement.  Ian Fleming's estate

---

[2] HIG does not concede that they are translations, for the reasons provided *infra*. However, it adopts the term translation for the sake of the argument to show that, by even Netflix's own argument, it has infringed upon HIG's copyright.

1  would still have rights to the original *Dr. No* novel and the James Bond character,

2  and the unauthorized *Dr. No* movie would be infringing of those rights too.

3    Second, as a matter of law, a derivative work is one that is based upon "one <u>or</u>

4  <u>more</u> preexisting works," such that a third work may be derivative of two

5  preexisting works.  17 U.S.C. § 101 (emphasis added).  Because the Complaint

6  plausibly alleges that the words in the dubbed and subtitled versions of *#Saraitda*

7  came from the Script, it follows that (a) they are solely derivative of the Script or (b)

8  they are derivative of both the Script and Korean-language movie.  Either way, the

9  dubbed and subtitled versions of *#Saraitda* are derivative works based on the Script.

10   ***The exclusive right to reproduce, distribute, and perform.***  HIG also has the

11  exclusive right to reproduce, distribute, and publicly perform copies of the Script

12  "by any method . . . from which the work can be perceived, reproduced, or

13  otherwise communicated." 17 U.S.C. § 101. The Complaint plausibly alleges that

14  Netflix's production of dubbed/subtitled versions of *#Saraitda* are copies of the

15  Script because those versions reproduced the words of the Script by a method from

16  which its words could be perceived—audio reproduction through new interpretive

17  acting in the case of dubbing, and visual reproduction in the case of subtitling.

18  Netflix's streaming of the dubbed/subtitled versions of *#Saraidta* then also

19  constitute distributions and public performances of the Script, or derivatives thereof.

20  As Nimmer notes, "if the right to make derivative works, *i.e.,* the adaptation right,

21  has been infringed, then there is necessarily also an infringement of either the

22  reproduction or performance right." 2 NIMMER ON COPYRIGHT § 8.09[A][1].

23    **2.    Netflix's Korean-law arguments based on the Naylor-Zip**

24      **Agreement are meritless.**

25    Unable to avoid liability under U.S. law, Netflix says that it has the right to

26  make translations of *#Saraitda* under the Korean Copyright Act because that Act

27  presumes that a copyright owner who transfers movie rights grants the right to make

28

1  a "translation" of the movie. MTD 9:4–26. The Korean Copyright Act does not

2  apply here and, at all events, does not help Netflix.

**a.  Korean law does not apply to HIG's Complaint.**

4      Netflix relies ████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████  MTD 9:10–12.  That clause does not apply here for two reasons.

7      First, ████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████

9  ██████████████████████████  *See So v. Land Base, LLC*, 2009 WL

10  5088745, at *3 (C.D. Cal. Dec 16, 2009) (declining nonparty's request to enforce

11  choice of law clause). Any rights it has were granted by Lotte Entertainment, which

12  itself got them from Zip and Perspective. But Netflix has not produced any

13  agreement between Zip/Perspective and Lotte, and thus has not proved what (if any)

14  rights Lotte could or did to transfer to Netflix, including whether whatever was

15  conveyed enabled it to enforce the choice of law clause. ████████████████████

16  ████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  As such, Netflix has not shown that it has any standing to invoke the choice of law

19  clause.

20      Second, Korean copyright law does not apply extraterritorially. Netflix is not

21  trying to resolve a dispute about what the Naylor-Zip Agreement means. ██████████

22  ████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████

24  Instead, it has reached for the Korean Copyright Act to argue that a provision of that

25  Act relating to cinematization determines the extent of the copyright protection HIG

26  has in the Script and conclude that HIG could not claim infringement. But a Korean

27  court would not apply the Korean Copyright Act for this purpose. Korea has been a

28  signatory to the Berne Convention for the Protection of Artistic and Literary Works

since August 21, 1996 and the United States since March 1, 1989. Under Berne, "the extent of [copyright] protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where [copyright] protection is claimed." Berne Convention for the Protection of Literary and Artistic Works art. 5(2), Sept. 28, 1979. All contracting parties to the Berne Convention adhere to the principle that copyright law has no extraterritorial application. *Id.* Here, HIG claimed copyright protection in the U.S. and infringement under the U.S. Copyright Act. Korean law does not apply.

   **b.   Even if the Korean Copyright Act applies, Netflix has failed to show it would defeat HIG's claims as a matter of law.**

   Translation is a difficult art and there are myriad ways in which texts, including foreign statutes, can be interpreted. With good reason, therefore, courts have declined to apply foreign statutes at the pleading stage, especially when provided only a single purported translation and no expert testimony as to how the law applies and is interpreted by a foreign court. *See, e.g., United States v. 10th Century Cambodian Sandstone Sculpture*, 2013 WL 1290515, at *8 (S.D.N.Y March 28, 2013) (rejecting a party's argument that a "court must, on a motion to dismiss, examine the translation of foreign law at issue without the aid of expert testimony or any other evidence to determine whether it is clear and unambiguous."). This Court should decline Netflix's invitation to render a definitive verdict based on the purported meaning of Korean law at this time.

   **c.   The Netflix-Zip Agreement expressly stipulates that Naylor did not transfer the right to translate #*Saraitda*.**

   Relying on Article 99, Section 2 of the Korean Copyright Act, Netflix argues that Naylor granted Zip and Perspective the exclusive right to make translations of #*Saraitda* because the Naylor-Zip Agreement did not "expressly stipulate" otherwise. MTD 9:24–26. On the contrary, HIG has plausibly alleged that it did

1  stipulate otherwise. █████████████████████████████████████

2  ███████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  █████████████████████████████████████████████

5  ████████████████████████████████ Under Korean law, the

6  right to translate is a derivative right.

7       ***Naylor did not grant translation rights.***  Naylor's grant of a license to make

8  the Korean Picture did not include translation rights. Netflix incorrectly argues

9  otherwise, claiming that the dubbed and subtitled versions of *#Saraitda* are not

10  "new" derivative works but are merely part and parcel of the Korean Picture itself.

11  MTD 10:19–20. As we have shown, however, the Complaint plausibly alleges that

12  the dubbed and subtitled versions are derivative works that are distinct from the

13  Korean Picture. And that result is no different under the Korean Copyright Act

14  because that Act defines a "derivative work" as a "creative work produced by means

15  of translation, arrangement, alteration, dramatization, cinematization, etc. of an

16  original work." *See* Jeojaggwonbeob [Copyright Act] art. 5 para. 1 (S. Kor.) ("S.

17  Kor. Copyright Act").[3] The dubbed/subtitled versions of *#Saraitda* are not a part of

18  the Korean Picture, but rather are a derivative work that is a translation of the

19  Korean Picture.

20       The Complaint also plausibly alleges that the dubbed/subtitled versions of

21  *#Saraitda* are not part and parcel of the Korean Picture because neither version is

22  "in the Korean language" as required by the Naylor-Zip Agreement. The dubbed

23  versions are not "motion picture[s] in the Korean language" because the dialog in

24  those versions is spoken in languages that are <u>not</u> Korean by actors who are <u>not</u> the

25  original Korean actors. *See Dubbed*, Merriam-Webster, https://www.merriam-

26

27  ─────────────
[3] Translations are available from the Korean Law Translation Center and the Korean Copyright
Commission at https://elaw.klri.re.kr/eng_service/lawView.do?hseq=42726&lang=ENG or

28  https://www.copyright.or.kr/eng/laws-and-treaties/copyright-law/chapter02/section01.do. To the
extent the Court decides to look at Korean statutes, are sources it may consider.  *See deFontbrune
v. Wofsy*, 838 F.3d 992, 997 (9th Cir. 2016).

webster.com/dictionary/dubbing. The subtitled versions are not "motion picture[s] in the Korean language" because the dialog is reproduced in writing in numerous languages other than Korean and is thus plausibly considered a film in two languages or, at a minimum, not merely a "motion picture in the Korean language." Netflix may ultimately produce an expert positing that the dubbed and subtitled versions are really part of a single, Korean-language film. But the viability of that position is a fact issue for trial, not for a Rule 12(b)(6) motion.

**The parties expressly stipulated that translation rights did not transfer.** The ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ As Netflix basically acknowledges, *see* MTD 10:13–17, 13:22–24, ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *See id.* █████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

Netflix works hard to dodge this conclusion, but its arguments are make-weight.  First, ██████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████ MTD 10:14–16. ██████████████████████████████ ████████████████████████████ Because the dubbed and subtitled versions of *#Saraitda* Netflix produced were separate derivative works, the right to make them were frozen and not available for Netflix to exploit.

1   Second, ███████████████████████████████████████████████

2   ██████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████

4   ███████████████████████████████ MTD 11:21–23.  But that is not proper

5   Rule 12(b)(6) argument: The extent of *#Saraitda*'s potential appeal outside Korea is

6   a fact question, not something the Court can resolve on the pleadings. And because

7   Netflix acknowledges that there are people outside of Korea who speak Korean, its

8   claim that the right to distribute *#Saraitda* universally is "meaningless" without

9   translation rights is wholly inaccurate. That right may have less value than the right

10  to distribute dubbed and subtitled versions of *#Saraitda* universally and in all

11  languages. ███████████████████████████████████████████████

12  ██████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  Third, the same conclusion applies to Netflix's arguments that ████████

16  ██████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  MTD 11:24–12:7. That argument hinges on fact questions concerning the appeal of

19  a Korean-language film in those settings.  And on its face, ██████████████

20  ██████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████

24  ████████

25  Fourth, Netflix's assertion that █████████████████████████████

26  ████████████████████████████████████████████████████

27  somehow supports is position does not make sense. MTD 11:28–12:2. ██████

28  ██████████████████████████████████████████████████████



**d.** **Any translation rights do not extend to versions of *#Saraidta* that were dubbed and subtitled in English.**

While Netflix argues that this reservation does not apply because it refers only to , this is plainly wrong as a matter of interpretation.

. Dkt. 33-2 § 1(a) (emphasis added).

Put differently, if the parties meant only that

Further,

1 █████████████████████████████████████████████████████

2 ███████████████████ In contrast, it is easy to understand why Naylor ███████████

3 ████████████████████████████████████████: He intended to sell the Script to

4 someone who wanted to make a new English movie. As HIG's experience with

5 *Alone* proves, that right would have been far less valuable if its owner risked getting

6 scooped by a version of a foreign film based on the same Script.

        **e.    Any translation rights do not extend to dubbed versions**

7

8               **of *#Saraitda*.**

9       The translation rights to *#Saraidta* also do not extend to Netflix's dubbed

10 versions of the movie because the Complaint plausibly alleges that those versions

11 are not mere "translations" of the original film. On the contrary, the Complaint

12 alleges that Netflix used new and sophisticated dubbing techniques and technologies

13 "that Netflix itself recognizes are an 'art' form" and produce a product so different

14 that "Netflix has taken foreign movies which would previously have only enjoyed

15 niche art-house audiences and, by creating derivative versions dubbed in local

16 languages . . . made them widely accessible." Compl. ¶ 29. These new dubbed

17 versions feature new dramatic performances from non-Korean actors who are not

18 actors in the original Korean version, thereby "add[ing] something new to the

19 underlying work[]" beyond mere translation. *Nat'l Ctr. For Jewish Film v. Riverside*

20 *Films LLC*, 2012 WL 4052111, at *3 (C.D. Cal., Sept. 14, 2012) (finding that

21 "voiceovers, editing, and overall [post-]production" transformed the underlying

22 work). Thus, the Complaint plausibly alleges that Netflix had no rights to produce

23 dubbed versions of *#Saraidta* even if they otherwise had so-called translation rights

24 because those versions were not translations, which, per Article 99, only exist when

25 the exploitation is "in the same manner as the cinematographic work."  The addition

26 of entirely new performances by new non-Korean voiceover actors in the dubbed

27 version of *#Saraidta* makes the exploitation fundamentally of a different "manner."

28

1    **3.    The Complaint plausibly alleges that HIG has standing.**

2        Netflix argues that HIG lacks standing because its exclusive rights to the

3    Script do not extend to translations of *#Saraidta*. That misses the mark under either

4    U.S. or Korean law.  We summarize why here.

5        ***U.S. law.***  As explained in Section A.1, the Complaint plausibly alleges that

6    the dubbed and subtitled versions of *#Saraidta* are derivative works based on the

7    Script and the movie—the Script providing elements like story and dialog, and the

8    movie providing elements like visuals and dramatic performances. The production

9    of *#Saraidta* did not affect Naylor's exclusive rights to the Script: He retained them.

10   Zip and Perspective had only the right to the new elements of the movie. As

11   explained in Section A.2.b, ███████████████████████████████████

12   ████████████████████████████████████████

13   █████████████████████████████████████████

14   ██████████████████    When Netflix made new versions of *#Saraitda* that used

15   elements of the Script (e.g., dialog) without a license, it infringed the exclusive

16   rights to the Script HIG got from Naylor.

17       Contrary to Netflix's contention, MTD 13:19–27, ███████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   ███████████████████████████    The Korean Picture and the Script

21   were separately defined terms, the former meaning the Korean-language movie and

22   the latter meaning Naylor's Script. As a result, ████████████████████

23   █████████████████████████████████████████

24   ███████████████

25       Alternatively, even if—contrary to its express terms—██████████████

26   █████████████████████████████████████████

27   ████████████████████████████████████████

28   ███████████████████████████████████████



***Korean law.*** Even if Korean law applies, the derivative rights and contractual issues are the same. *See* S. Kor. Copyright Act art. 5 para. 2 ("The protection of a derivative work shall not affect the rights of the author of the original work."). The question is whether Naylor granted Zip and Perspective translation rights by operation of law. As explained in Section A.2, they did not because (a) ██████████ ██████████████████████████, (b) dubbed versions of *#Saraidta* are not translations, and (iii) ████████████████████████████ and the production of dubbed and subtitled versions of *#Saraidta* that use elements of the Script infringe those rights.

   At the end of the day, the problem for Netflix is that there were two parties with exclusive rights to separate elements of *#Saraidta*—Naylor on the one hand and Zip and Perspective on the other. To produce the dubbed and subtitled versions of *#Saraidta*, Netflix needed to get licenses to each bundle of elements.  Netflix decided not to do so. As one of the most sophisticated players in the industry, Compl. ¶ 40, that failure rests squarely on its shoulders.

**B.    The Court Should Not Dismiss for Forum Non Conveniens.**

Netflix has failed to show that the private and public interest factors call for dismissal for *forum non conveniens*, which is "an exceptional tool to be employed sparingly." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000). That is especially true in this case because "[w]hen a domestic plaintiff initiates litigation in its home forum, it is presumptively convenient." *Carijano v. Occidental Petrol. Corp.*, 643 F.3d 1216, 1227 (9th Cir. 2011). HIG is an LLC organized under California law and located in California. Declaration of Rabih Aridi ("Aridi Decl."), Ex. A hereto, ¶ 2. As a result, Netflix bears the "heavy burden of showing that [HIG's] choice of forum results in oppressiveness and vexation out of all proportion to [HIG's] convenience." *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1210 (9th Cir. 2017) (cleaned up). It has failed to do so.

***The private interest factors.*** Netflix's presentation on the private interest factors is thrice deficient. MTD 16:21–17:24. First, Netflix ignores the substantial connections that the parties, witnesses, and evidence have to California. HIG and Netflix are located here, as are most of the witnesses. HIG expects that key witnesses (all California-based) will include (a) Rabih Aridi, HIG's CEO and owner; (b) Johnny Martin, the director of *Alone*, ███████████████████ ███████████████████████████████████████████ (c) Anne Jordan, ███████████████████████████████████████████ (d) Naylor, who authored the Script and ███████████████████████████████████████; (e) Highland Sales, the sales agent for *Alone*; and (f) Grindstone Pictures, the U.S. distributor for *Alone*. Aridi Decl. ¶ 3. All of HIG's documents are located in California, *id.* ¶ 4, and because Martin, Jordan, Naylor, Highland, and Grindstone are all located in California, their documents can be expected to be found here too. And all of these witnesses can be expected to incur substantial inconvenience if this case is required to proceed thousands of miles away in Korea.

17

Second, Netflix's assertions about the location of witnesses and documents are unsupported by evidence, thereby dooming its claims about party/witness location and convenience. *See U.S. Small Bus. Admin. v. Rocket Ventures II, L.P.*, 2013 WL 57854, at *6 (N.D. Cal. Jan. 3, 2013) (denying *forum non conveniens* motion because "Defendants do not provide any evidence" on the private and public interest factors). Without proof, Netflix claims that it "has little evidentiary role in this case." MTD 17:4–6. But Netflix purports to have acquired rights to make dubbed and subtitled versions *#Saraidta* and can be expected to have witnesses and documents relevant to that key issue. Further, HIG has alleged that Netflix's infringement was willful based in part on Netflix's desire to exploit Korean content, which is so profitable that even its co-CEO publicly comments on it. The idea that Netflix—located in California—is not likely to have important witnesses and documents beggars belief, as does Netflix's suggestion that "the majority of witnesses and records" regarding "the intent of the . . . parties" to the various licensing agreements are located in Korea. MTD 17:17–18. Naylor, the most important party to the Naylor-Zip Agreement, is in California. Perspective, one of the counterparties to the Naylor-Zip Agreement, claims to be "based in Los Angeles and Seoul," and two of its employees make the same claim.  Salario Decl. ¶¶ 2, 3.

Third, Netflix's claim that this Court lacks the power to compel the production of evidence and attendance of witnesses under Rule 45 is overblown.. MTD 17:18–19. The majority of witnesses and evidence are located within the U.S.—specifically, in California—and thus within this Court's reach. In any event, Rule 28 provides means to depose a witness abroad, and Korea and the United States are both parties to the Hague Convention on the Taking of Evidence Abroad, which will enable Netflix to obtain documents and evidence to present its case.

***The public interest factors.***  Netflix's presentation on the public interest factors similarly falls short of the requirement that they "clearly point toward trial in the alternative forum." *Carijano*, 643 F.3d at 1221. First, Netflix ignores the

substantial extent to which U.S. law is implicated by this case. Netflix touts Korean law as though the only issue in the case is whether the Naylor-Zip Agreement conveyed translation rights to Zip and Perspective. MTD 18:3–5. But Netflix presumably also intends to litigate whether its dubbed and subtitled versions of *#Saraitda* actually copied the Script, whether its infringement was willful, and whether HIG is entitled to damages and, if so, how much. Not even Netflix has argued that those issues are resolved by reference to anything other than U.S. copyright law, which this Court has the both the interest and expertise in interpreting and applying in a case brought by a California plaintiff. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1446 (9th Cir. 1984) (reversing order dismissing on *forum non conveniens* grounds in part because "Arizona has a significant interest in interpreting its own laws" and "in protecting its companies from trademark infringement abroad").

Second, Netflix's assertion that deciding this case will involve material disputes about Korean law and custom is unsupported even by an example, let alone evidence. MTD 18:8–10. If this case really involved thorny Korean-law issues, Netflix would have supported its arguments about what the Naylor-Zip Agreement means and how Korean law treats translation rights with a declaration of a Korean law expert to explain how the statutes and contractual provisions work and how Korean courts have decided similar disputes. *See de Fontbrune v. Wofsy*, 838 F.3d 992, 1000 (9th Cir. 2016) (holding that courts can consider such materials on a motion to dismiss). That Netflix proceeded solely on copies of the Naylor-Zip Agreement and a Korean statute speaks volumes about how complex it really thinks the Korean law and custom issues are and whether it is oppressive for this Court to handle them.

Third, Netflix's argument that not dismissing this case will take this District from 10,769 to 10,770 civil cases is not a persuasive argument on docket congestion. MTD 18:19–25. If it were, this factor would favor dismissal in every

19

case. Netflix has identified nothing about this case to suggest that it will be such a drain on judicial resources that court congestion has any materiality as a factor. *Gates Learjet*, 743 F.2d at 1337 (9th Cir. 1984) ("The forum non conveniens doctrine should not be used as a solution to court congestion.").

Ultimately, this is a case brought by a California plaintiff under U.S. law, where the principal defendant is located in California, one of the Korean defendants and its employees claim to be in California, and where principal witnesses and documents are located in California. Netflix has presented nothing to carry its heavy burden of showing that the presence of Korean defendants, some Korean witnesses and documents, and the (disputed) applicability of Korean law to one issue results in oppressiveness or vexation and clearly requires litigation in Korea. Indeed, the court reached this exact conclusion in *DSFB Kollective Co. Ltd. v. CJ E & M Am., Inc.*, 2015 WL 12781211 (C.D. Cal. June 4, 2015), when a Korean plaintiff sued an American and a Korean defendant for copyright infringement in the U.S., and the defendants moved to dismiss for *forum non conveniens*. *Id.* at *1–2. The issues raised by the defendants mirrored those raised by Netflix here—applicability of Korean law, existence of Korean witnesses, and the like. The court denied the motion, reasoning that "regardless of where the case is tried, the litigation will require application of Korean law . . . and U.S. law . . . involve at least some witnesses and documents from Korea and some from the United States . . . [and] some evidence . . . in English and some . . . in Korean." *Id.* at *3. On that record, the private and public interest factors "cancel[ed] each other out" and, as a result, that the defendants "fail[ed] to carry their burden of showing that the [were] entitled to the exceptional tool of a dismissal under *forum non conveniens*." *Id.* at *4.

Here, the case against a *forum non conveniens* dismissal is much stronger. HIG is a located in California and is entitled to an even stronger presumption against dismissal. *See Cooper*, 860 F.3d at 1211 ("Plaintiffs are U.S. citizens, and their decision to sue in the United States must be respected."). There are a significant

California witnesses and documents, a significant interest in applying U.S. law, no showing that Korean witnesses, documents, or law will loom so large that litigation here would be oppressive. There is no reason for this case to proceed in Korea.

### C.   Dismissal Under Rule 19 Is Improper.

Under Rule 19, a party is necessary/indispensable if and only if "complete relief cannot be granted in its absence" or "the absent party's participation is necessary to protect its legally cognizable interests or to protect other parties from a substantial risk of incurring multiple or inconsistent obligations because of those interests." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879–80 (9th Cir. 2004). The moving party squarely bears the burden of proving the necessity of joinder. *Bekins v. Zhelznyak*, 2016 WL 126729, at *2 (C.D. Cal. Jan. 11, 2016). Netflix cannot and does not meet this burden.

First, it is hornbook law that, in a suit for copyright infringement, "[a]ll infringers are jointly and severally liable [and] plaintiff may choose whom to sue and is not required to join all infringers in a single action." WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1614 (3d ed. 1998); *see also Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). "Under the principle of joint and several liability, "the victim of a tort is entitled to sue any of the joint tortfeasors and recover his entire damages from that tortfeasor." *Salton, Inc. v. Philips Domestic App. & Per. Care*, 391 F.3d 871, 877 (7th Cir. 2004). As such, courts uniformly hold that "a joint tortfeasor not joined in a lawsuit is not a person in whose absence complete relief cannot be accorded within the meaning of Rule 19. . . ." *Arkeyo, LLC v. Saggezza, Inc.*, 2021 WL 2254959, *9–10 (N.D. Ill., June 3, 2021).

Relying on these principles in *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035 (D.C. Cir. 1981), the D.C. Circuit reversed a district court's dismissal of copyright infringement counterclaims for failure to join indispensable parties, finding that a suit brought only against the seller of an infringing book, and not the third party who had printed the book or a separate third party who held the purported license to

create the book, could not result in dismissal for failure to join either of the third parties. The court held that "the copyright holder may proceed against any member of the chain of distribution" because copyright infringement "is analogous to other tort actions and infringers are jointly and severally liable [and] plaintiff need sue only such participants as it sees fit." *Id.* at 1043-44; *see also Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 360 (2d Cir. 2000) (reversing dismissal of copyright infringement complaint under Rule 19 because the plaintiff has the right to sue any single member in the chain of distribution).

And in *Gilliam v. ABC*, 538 F.2d 14, 25 (2d Cir. 1976), the Second Circuit reversed a district court's denial of a preliminary injunction in a copyright infringement case for failure to join an alleged indispensable party under Rule 19. There, the plaintiffs had granted the BBC a license to broadcast a television program, which the BBC sublicensed the rights to Time-Life, which subsequently sublicensed a portion of those rights to ABC. *Id*. at 17. The plaintiffs claimed that ABC exceeded the scope of the license they granted the BBC and sued for infringement. The district court denied the injunction because the plaintiff did not join the BBC and Time-Life. *Id.* The Second Circuit held instead that "[c]omplete relief for the alleged infringement . . . may be accorded between [the plaintiff and defendant], which alone broadcast the programs in dispute." *Id.* at 26.

Netflix's reliance on *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002), is unavailing. MTD 20:3–7. That case dealt with whether an employment policy violated the Civil Rights Act, not liability for copyright infringement. To the extent Netflix means that because this case will involve the interpretation of certain licenses, all parties to those licenses parties must be joined, it is wrong.  In *Gilliam v. ABC*, 538 F.2d 14, 26 (2d Cir. 1976), the Second Circuit reversed a district court's order for reaching that same conclusion, holding that because liability for copyright infringement is joint and several, the plaintiff was not required to join the entire chain of distribution.

1    Netflix's argument for deviation from established precedent—grounded in its

2    claim that "an adjudication of Plaintiff's claim that *Alive* infringes Plaintiff's rights

3    would require a showing that Plaintiff, and not the Defendants, has the exclusive

4    right to translate *#Saraitda*," MTD 19:25–27,—is also unpersuasive. Netflix cites to

5    3 NIMMER ON COPYRIGHT § 12.03 to support its proposition that "joinder should

6    occur if an issue is raised as to the validity of the copyright upon the rights of the

7    persons to be joined, as well as those of the plaintiff." MTD 20:1–3. Netflix,

8    however, quotes this passage out of context and ignores the fact that § 12.03 goes on

9    to state that "[a]ny member of the distribution chain may be sued without the need

10   to join any of the other infringers." 3 NIMMER ON COPYRIGHT § 12.03 (emphasis

11   added). More fundamentally, this situation in this case is not one where the actual

12   validity of a copyright (*e.g.*, whether there is an original work of authorship here

13   fixed in a tangible medium that meets the subject matter requirements of 17 U.S.C.

14   § 102) is at issue. If the validity of a copyright is challenged, it might make sense

15   that a licensee or a copyright co-owner might be joined in order to prevent said

16   parties from having their rights severely affected. Here, however, Netflix essentially

17   concedes that the only question is whether the licenses on which Netflix relies

18   entitled it to produce dubbed and subtitled versions of *#Saraidta*. *See* MTD 20:11–

19   14. There is no issue of copyright validity.

20   Furthermore, nothing suggests that "complete relief cannot be granted in [the]

21   absence" of Lotte, Zip, or Perspective or that their "participation is necessary to

22   protect [their] legally cognizable interests or to protect other parties from a

23   substantial risk of incurring multiple or inconsistent obligations because of those

24   interests." *Disabled Rights Action Comm.*, 375 F.3d at 879–80. Indeed, even if they

25   have some interest in the copyrights at issue, they would not be impaired by [their]

26   absence" because their interests are aligned with Netflix's. *See Joe Hand*

27   *Promotions, Inc. v. Bragg*, 2014 WL 2589242, *9 (S.D. Cal., June 10, 2014)

28

1  (rejecting 12(b)(7) motion for failure of plaintiff to join third party from whom
2  infringer-defendant claimed to have received a license).

3       Netflix's position is also untenable on public policy grounds, as any future
4  defendant accused of infringement could then claim that they received rights to
5  make use of the copyrighted work in question from someone named Bob located in
6  a country without intellectual property protections.  Bob in that country would be an
7  indispensable party without whom the case cannot proceed. Of course, Bob is not
8  subject to the personal jurisdiction of this Court, is impossible to find, and lives in a
9  country with no intellectual property laws. If it is an indispensable party, every
10 would-be pirate in this judicial district could simply claim a license from Bob and
11 evade liability for their brazen acts of infringement. Such a holding would make it
12 impossible for Netflix and other motion picture studios to enforce their rights
13 against those who would infringe them.  Netflix's position is not supported by any
14 precedent and for good reason: it would make an unenforceable mess of our
15 copyright regime.

16      Finally, in the unlikely event that this Court determines that the Korean
17 Producers and Lotte are indispensable parties, that does not require automatic
18 dismissal.  Rather the court must still determine whether joinder of the so-called
19 indispensable parties is feasible, and, if it is not, per the "equity and good
20 conscience" factors detailed in Fed. R. Civ. P. 19(b), the case can still proceed with
21 the existing parties.  Netflix's flippant suggestion that that HIG can simply file suit
22 in the Republic of Korea—which is almost 7000 miles from where the Plaintiff is
23 located, where Defendant Netflix is headquartered (and some 10,000 miles from
24 where it's incorporated), and where the most significant third-party witness, Matt
25 Naylor, is located—is disinguous and would deeply prejudice the ability of
26 Plaintiff to obtain relief.  Moreover, in *Gilliam*, the Second Circuit found it relevant
27 that neither of the parties claimed by the defendant to be indispensable had "claimed
28 any interest in the subject matter of this litigation." *Gilliam*, 538 F.2d at 26.  The

1   same is true in this case.  Indeed, Zip and Perspective have even refused to accept
2   service of process of this lawsuit and have forced Plaintiff to undergo the lengthy
3   and expensive process of service through the Hague Convention and have also
4   indicated that they dispute personal jurisdiction over their clients and will resist
5   efforts to be brought into this suit. Salario Decl. ¶ 6.

6           **D.       Plaintiff Requests Leave to Amend.**

7           Federal Rule of Civil Procedure 15(a) provides generally that leave to amend
8   the pleadings before trial should be given freely "when justice so requires." Fed. R.
9   Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence*
10  *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Plaintiff does not
11  consider that additional pleading is necessary. Nevertheless, if this Court disagrees
12  and grants Netflix's motion to dismiss in any part, then Plaintiff respectfully
13  requests leave to amend the allegations where necessary.

14  **IV.   CONCLUSION**

15          For the foregoing reasons, Netflix's motion to dismiss should be denied.

16  Dated: February 25, 2022                    **ONE LLP**

17

18                                   By:  /s/ John Tehranian
19                                        John Tehranian, Esq.
                                          Peter Afrasiabi, Esq.
20                                        **ONE LLP**

21                                        Maximillian Amster
22                                        Samuel J Salario Jr., Esq.
                                          **BAY ADVOCACY PLLC**
23
24                                        Attorneys for Plaintiff,
                                          Hollywood Innovations Group, LLC
25

26

27

28