KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
JOHN L. SCHWAB (State Bar No. 301386)
john.schwab@mto.com
MICA L. MOORE (State Bar No. 321473)
mica.moore@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Netflix, Inc.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| HOLLYWOOD INNOVATIONS GROUP LLC,<br><br>Plaintiff,<br><br>vs.<br><br>NETFLIX, INC., a Delaware Corporation, ZIP CINEMA CO. LTD., a South Korean Corporation, KAKAO ENTERTAINMENT CORP., a South Korean Corporation, PERSPECTIVE PICTURES CO. LTD, a South Korean Corporation, and Does 1-10, inclusive,<br><br>Defendants. | Case No. 2:21-cv-9423<br><br>**DEFENDANT NETFLIX, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS COMPLAINT**<br><br>Judge: Hon. André Birotte Jr.<br>Date: March 25, 2022<br>Time: 10:00 a.m.<br>Ctrm: 7B |

# TABLE OF CONTENTS

| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. ARGUMENT | 3 |
|    A. The Opposition Confirms That HIG Does Not And Cannot Plausibly Allege Netflix Infringed Any Right That HIG Acquired From Naylor | 3 |
|       1. Netflix May Raise, And The Court May Consider, The Undisputed Text Of Article 99 Of The Korean Copyright Act | 4 |
|       2. Naylor Did Not Retain The Right To Translate *#Saraitda* | 6 |
|       3. The ▮▮▮▮▮▮▮▮▮▮ Is N▮▮▮ Rights And, Even If It Were, HIG's Claim Would Still Fail | 8 |
|       4. Any Amendment Would Be Futile | 12 |
|    B. HIG's Opposition Confirms That, If The Complaint Is Not Dismissed Under Rule 12(b)(6), It Should Be Dismissed For Forum Non Conveniens Or Under Rule 19(b) | 12 |
|       1. Both Private And Public Factors Favor Dismissal For Forum Non-Conveniens | 13 |
|       2. The Korean Defendants And Lotte Entertainment Are Indispensable Parties Because HIG Is Seeking To Invalidate Their Contractual Rights | 14 |
| III. CONCLUSION | 15 |

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Bassett v. Mashantucket Pequot Tribe*,
  204 F.3d 343 (2d Cir. 2000) ................................................................................ 15

*Costello Pub. Co. v. Rotelle*,
  670 F.2d 1035 (D.C. Cir. 1981) .......................................................................... 15

*Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*,
  61 F.3d 696 (9th Cir. 1995) ................................................................................. 13

*de Fontbrune v. Wofsy*,
  838 F.3d 992 (9th Cir. 2016) ........................................................................ 2, 5, 6

*Fahmy v. Jay-Z*,
  908 F.3d 383 (9th Cir. 2018) ................................................................................. 5

*Gilliam v. ABC*,
  538 F.2d 14 (2d Cir. 1976) ............................................................................ 14, 15

*Pizzorno v. Draper*,
  No. 17-00182-AB, 2017 WL 4712071 (C.D. Cal. July 7, 2017) ......................... 12

*So v. Land Base, LLC*,
  No. CV 08-03336 DDP, 2009 WL 5088745 (C.D. Cal. Dec. 16, 2009) .................................................................................................................. 4

*Tierney v. Image Ent., Inc.*,
  No. CV-11-1305 DSF, 2012 WL 13008214 (C.D. Cal. Mar. 21, 2012) .................................................................................................................. 5

*United States v. A 10th Century Cambodian Sandstone Sculpture*,
  No. 12 CIV. 2600(GBD), 2013 WL 1290515 (S.D.N.Y. Mar. 28, 2013) .................................................................................................................. 6

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ................................................................................. 4

*Vance v. Am. Soc'y of Composers*,
  271 F.2d 204 (8th Cir. 1959) ............................................................................... 15

# TABLE OF AUTHORITIES
## (Continued)

**Page**

**FEDERAL STATUTES**

17 U.S.C. § 101 ................................................................................................. 5, 8

**STATE RULES**

Rule 12(b)(6) ..................................................................................................... 4, 12

Rule 19 .................................................................................................................. 14

Rule 19(b) .......................................................................................................... 2, 12

Rule 44.1 ................................................................................................................ 5

**RULES - OTHER**

Fed. R. Civ. P. 19(a)(1)(B) ................................................................................ 2, 14

**OTHER AUTHORITIES**

Korean Copyright Act Article 99 ............................................................... 1, passim

3 *Nimmer on Copyright* § 12.02 (2021) ................................................................. 3

## I. INTRODUCTION

HIG's Opposition confirms it has no plausible copyright infringement claim against Netflix. The reasons for that are indisputable:

- HIG can only assert those rights to the *Devour* script that Matt Naylor, the author and original copyright owner, conveyed to HIG.[1] Specifically *excluded* from the rights Naylor conveyed to HIG were any that were ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Request for Judicial Notice ("RJN") Ex. C (Dkt. 40-2) § 2 (▬▬▬▬▬ ▬▬▬▬).

- Korean law governs the Naylor/Zip Agreement. *Id*. Ex. B (Dkt. 40-1) § 18. Under Article 99 of the Korean Copyright Act, because the "author[] [Naylor]" "authorize[d] another person [Zip and Perspective] to exploit his/her work [the script] by means of cinematization [making *#Saraitda*]," Naylor's authorization is "presumed to include" the right "to exploit the translation of" the same "cinematographic work [*#Saraitda*]." Chung Decl. Ex. A at 2-3(Dkt. 30-3) .

- The Article 99 presumption applies unless Naylor and Zip-Perspective (the "Korean Producers") "expressly stipulated" that it did not. *Id*. No such express stipulation appears in the Naylor/Zip Agreement.

HIG tried to distract from the underlying agreements by failing to attach them to its Complaint. Now, when confronted with the agreements, HIG throws everything at the wall to explain them away. Nothing sticks. For example, HIG argues that neither Netflix nor the Court can rely on Article 99 of the Korean Copyright Act on this 12(b)(6) motion, Opp. at 9, when Ninth Circuit law provides

---

[1] Naylor's agreement was with Rabih Aridi. But Mr. Aridi confirms that he is HIG's "sole member and managing member." Aridi Decl. ¶ 2 (Dkt. 44-6). This brief therefore uses "HIG" to include Mr. Aridi and the rights he did (and did not) acquire from Naylor.

1  the opposite. *de Fontbrune v. Wofsy*, 838 F.3d 992, 997 (9th Cir. 2016). HIG also
2  claims that Naylor did not give the Korean Producers any right to translate Naylor's
3  script insofar as the script was embodied in the movie. Opp. at 5–6. If that
4  argument were correct, then the right to translate the movie that Article 99 provides
5  would be meaningless. And HIG argues that, even if Article 99 applies, the
6  Naylor/Zip Agreement's ▮▮▮▮▮▮▮ provision, RJN Ex. B § 1(a), "expressly
7  stipulates" that Naylor was retaining the right to translate *#Saraitda*. Opp. at 9. The
8  ▮▮▮▮▮▮▮▮ says nothing about translation rights or the Article 99
9  presumption. But even if the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 were an express stipulation for purposes of Article 99, that would not help HIG: in
11 that case, the translation right would have been frozen as between Naylor and the
12 Korean Producers, and it would not have been a right that Naylor could have or did
13 transfer to HIG. Try as it might, HIG cannot show that it has standing to assert the
14 right it claims Netflix infringed. The Complaint must be dismissed.

15     HIG's arguments on forum non conveniens and Rule 19(b) likewise fail.
16 HIG's position is that: (1) it can argue for an interpretation of the Naylor/Zip
17 Agreement that does not appear on the face of that Agreement, *see* Opp. 10–12 &
18 Compl. ¶ 15; (2) Netflix has no "standing" to argue the Agreement means what it
19 says, Opp. 8; and (3) the parties to that Agreement (who would have "standing"
20 under HIG's view) are not indispensable parties to a lawsuit that poses the question
21 of what rights were or were not set forth in that Agreement, Opp. 21–22. But the
22 absence of the Korean Producers would very obviously "impair or impede [their]
23 ability to protect the interest" they have in their own agreement, making them
24 indispensable. Fed. R. Civ. P. 19(a)(1)(B). And the Korean Producers, as well as
25 Lotte Entertainment, are based in Korea, whose courts would authoritatively

construe Korean law. All relevant public and private factors point toward dismissal for forum non conveniens.[2]

## II. ARGUMENT

### A. The Opposition Confirms That HIG Does Not And Cannot Plausibly Allege Netflix Infringed Any Right That HIG Acquired From Naylor

Black letter law provides that HIG "may not sue for infringement of rights as to which [it] is not licensed, even if the subject matter of the infringement is the work [the *Devour* script] as to which [it] is a licensee." 3 *Nimmer on Copyright* § 12.02 (2021). And HIG concedes that Naylor could not have transferred, and did not transfer, to HIG any rights that were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Opp. at 2. All this is fatal to HIG's infringement claim, because the Naylor/Zip Agreement gave the Korean Producers the right to make a movie based on the *Devour* script, i.e., to cinematize that script. Under Article 99, Naylor also gave the Korean Producers the right "to exploit the translation of a cinematographic work in the same manner as the cinematographic work" unless the parties "expressly stipulated" to the contrary, Chung Decl. Ex. A at 2–3, which they did not do. None of HIG's scattershot arguments resisting that conclusion withstands scrutiny.

---

[2] On March 3, HIG filed proofs that it had served Zip and Kakao Entertainment. Defendant Perspective, has not, to Netflix's knowledge, been served. As HIG's attorney declaration explains, at least Zip and Perspective intend to contest this Court's jurisdiction. Because Netflix's forum non conveniens and failure to join arguments directly raise the question of whether the Court has jurisdiction over those other defendants, Netflix requested that HIG agree to delay the hearing on this Motion until that issue was resolved. HIG did not agree to that request, but the parties are continuing to meet and confer about the issue. If HIG does not agree to continue the hearing, Netflix will file a motion asking the Court to delay hearing the Motion, or at least delay ruling on Netflix's forum non conveniens and joinder arguments, until after the Korean Defendants have been served and after this Court determines any jurisdictional issues.

### 1. Netflix May Raise, And The Court May Consider, The Undisputed Text Of Article 99 Of The Korean Copyright Act

Because Article 99 dooms HIG's case, HIG first makes a series of meritless arguments aimed at preventing this Court from even considering it. HIG claims that Netflix lacks standing to ask the Court to construe the Naylor/Zip Agreement in accordance with Korean law, ▌ ▌ RJN Ex. B § 18. HIG is wrong. Netflix asks the Court to construe the Naylor/Zip Agreement to determine what rights Naylor could, and did, convey to HIG. Because HIG references and relies on the Naylor/Zip Agreement to define the scope of rights it seeks to enforce in this action, the Court may treat the Naylor/Zip Agreement "as part of the Complaint, and thus may assume that its contents are true for purposes of a motion under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). And the Agreement says, on its face, that ▌ ▌ RJN Ex. B § 18.

HIG claims that *So v. Land Base, LLC*, No. CV 08-03336 DDP, 2009 WL 5088745 (C.D. Cal. Dec. 16, 2009), holds a party in Netflix's position may not rely on ▌ ▌ Opp. at 8. The case holds no such thing. The defendant argued that a choice-of-law provision in a contract to which he was not a party was in fact "a *forum selection clause*," and that plaintiff's fraud claim had to be venued in England. *Land Base*, 2009 WL 5088745, at *3. The Court noted in an aside that it was "not convinced that [defendant] has standing to enforce any purported forum selection clause" but went on to hold that it did not matter because the clause at issue was not, in fact, a forum selection clause. *Id.* Here, Netflix is not seeking to enforce a forum selection clause. It is merely asking the Court to construe ▌ ▌

-4-
DEFENDANT NETFLIX, INC.'S REPLY I/S/O MOTION TO DISMISS

HIG also is wrong that construing ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ would require the Court to apply "Korean copyright law … extraterritorially." Opp. at 8. HIG's claim is brought under the United States Copyright Act. But HIG concedes it is not the author of the allegedly infringed work. Its own rights in that work are determined by its agreement with the author, Naylor. The Court would, of course, look to California or New York law to define the scope of rights transferred under contracts governed by those states' laws. *See Tierney v. Image Ent., Inc.*, No. CV-11-1305 DSF, 2012 WL 13008214, at *4 (C.D. Cal. Mar. 21, 2012) ("Transfers and assignments of copyrights are contracts that are interpreted under state law."). The result is exactly the same where, as here, an agreement that defines the copyright plaintiff's rights is governed by foreign law: the Court must look to that law to determine the scope of rights transferred under the Naylor/Zip Agreement and, therefore, the scope of rights later granted to HIG. *See, e.g.*, *Fahmy v. Jay-Z*, 908 F.3d 383, 392–93 (9th Cir. 2018) (applying Egyptian law to determine whether an agreement transferred derivative rights).

      Finally, HIG argues that the Court should not consider Article 99 on this motion because Netflix has attached a translation of that statute and, HIG says, "[t]ranslation is a difficult art," and courts do not "apply foreign statutes at the pleading stage." Opp. at 9. HIG selectively ignores the Ninth Circuit's *de Fontbrune* decision, which expressly said district courts should *not* ignore foreign law at the pleading stage. The Ninth Circuit explained that Rule 44.1, which says that the content of foreign law is to be "'treated as a ruling on a question of law[,]' … endeavored to lay to rest th[e] antiquated conception of foreign law as 'a question of fact' …. by making the process of ascertaining foreign law equivalent to the process for determining domestic law." *de Fontbrune*, 838 F.3d at 997 (citations omitted).

1  HIG's only citation to the contrary is an unpublished district court decision,
2  which declined to decide, on a motion to dismiss, whether a translation of a 1900
3  decree in "the language 'of French Indochina'" was "clear and unambiguous"
4  because the parties had submitted that "its literal translation [was] subject to more
5  than one interpretation." *United States v. A 10th Century Cambodian Sandstone*
6  *Sculpture*, No. 12 CIV. 2600(GBD), 2013 WL 1290515, at *8 (S.D.N.Y. Mar. 28,
7  2013). Here, Netflix has submitted a sworn declaration from a Korean attorney,
8  fluent in both Korean and English, confirming that the English-language translations
9  of the Act were accurate. *See generally* Chung Decl. HIG had three weeks to
10 prepare its Opposition, yet it does not dispute that the translations are accurate and
11 does not proffer any alternate interpretation for Article 99's presumption that
12 translation rights transfer with cinematization rights. The Court can and should
13 apply the undisputed English-language translation of Article 99 to the Naylor/Zip
14 Agreement. *See de Fontbrune*, 838 F. 3d at 1000.

15 Moreover, HIG itself does not believe its own argument that the Court cannot
16 look to the undisputed translation of Korean law on this motion. Elsewhere in its
17 Opposition, HIG asks the Court to accept a translation of a different provision of the
18 Korean Copyright Act that HIG found on the Internet. Opp. at 10 & n.3. HIG relies
19 on none other than the *de Fontbrune* case for the proposition that the Court "may
20 consider" an undisputed translation of a foreign statute on a 12(b)(6) motion. *Id.*
21 HIG proves Netflix's point.

22 **2.  Naylor Did Not Retain The Right To Translate #*Saraitda***

23 HIG argues that whatever rights the Naylor/Zip Agreement conveyed to the
24 Korean-language movie, that Agreement did *not* convey translation rights with
25 respect to Naylor's "Original Script." Opp. at 10. But it did. Article 99 refers to
26 the "author's economic right" regarding "his/her work." Naylor's ("his") work is
27 the "Original Script." That is the only work Naylor is alleged to have owned.
28 Naylor granted Zip the right to "cinematize" that work, i.e., to make a movie based

on that script. And, under Article 99, unless the parties expressly stipulated otherwise, the right to "cinematize" included the right "[t]o exploit the translation" of that movie. Chung Decl. Ex. A at 2–3. If the cinematization right did not include whatever right Naylor may have had regarding the translation of the script embodied in the movie, the Article 99 presumption would be worthless. HIG points to nothing in the text of Article 99, any authoritative source construing that statute, or common sense to support that absurd result.

HIG's argument that Naylor did not transfer rights in the script is nonsensical for a different, but related, reason. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ But of course the Korean Producers needed to do so in order to produce a Korean language film—otherwise no actor would have known her or his line in Korean, and the director and other creative personnel behind the camera would not have known what they were to film. Under HIG's theory, Naylor granted the Korean Producers "only" the right to make a "Korean language" film based on an English-language script, but *not* the right to translate that screenplay into a Korean language script; and "only" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ RJN Ex. B. § 1, but *not* the right to translate the film into other languages. HIG's strained reading would render the rights granted in the Naylor/Zip Agreement illusory. That reading must be rejected.

HIG next tries to split the copyright rights at issue even further, arguing that even if Article 99 applies and transferred the right to translate #*Saraitda* to the Korean Producers, Naylor *still* retained the right to make "new dubbed versions" that "feature new dramatic performances from non-Korean actors who are not actors in the original." Opp. 14. The argument is semantics. HIG provides no basis in law or logic for presuming that the Korean Producers were granted a right to subtitle the film but not dub it, or to dub it but not with "non-Korean actors." Tellingly, HIG's Complaint alleges that Netflix infringed by creating "high-quality dubbed and

subtitled versions in" English and "an additional 30 languages for release on Netflix's streaming platform." Compl. ¶ 32. HIG's new argument is inconsistent with its allegations for a simple reason: HIG knows it cannot overcome the presumption of transfer under Article 99 and so is desperately trying to save any part of its meritless claim.

Finally, HIG claims that it owns the "entire copyright" to *Devour*, *see* Opp. at 3, and that United States copyright law therefore grants it broad rights, including translation rights to *#Saraidta*. Opp. 5–6. Alternatively, HIG claims that it owns the exclusive right to "reproduce, distribute, and publicly perform" any copies of the Script, and that translations of *#Saraitda* constitute such a copy. Opp. 7.

Both arguments fail at the threshold because they presume HIG has rights that HIG does not. HIG cites only provisions of the Copyright Act enumerating the exclusive rights that comprise a copyright. *E.g.*, Opp. at 6 (citing 17 U.S.C. § 101). But HIG *admits* that it did not acquire all of the rights in the bundle—it acquired only the rights that were remaining after Naylor transferred a subset of the rights in his screenplay to the Korean Producers, and froze others. *See* Opp. at 2 (acknowledging that Naylor's "complete assignment to Aridi" nonetheless "excluded ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"). As explained above and below, and in Netflix's Motion to Dismiss, HIG did not and cannot plausibly allege that it acquired the right to translate *#Saraitda*.

### 3. The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Is Not ▓▓▓▓▓s And, Even If It Were, HIG's Claim Would Still Fail

HIG argues that even if Article 99 applies, the presumed transfer of the right to translate *#Saraidta* is rebutted because Naylor and the Korean Producers purportedly "expressly stipulated that translation rights did not transfer." Opp. 11 (emphasis omitted). According to HIG, the parties made that "express stipulation" with the following sentence: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

██████████████████████████████████████████████████████████████ RJN Ex. B at 2; *see also* Opp. 13.

HIG is wrong that the ████████████ included an "express stipulation" to freeze the right to translate the cinematized work based on Naylor's Original Script. As Netflix has already explained, the ██████ provision explicitly addresses only ████████████████████████████████████████ and the like. RJN Ex. B at § 1(a). ████████████████████████████████████ much less "express[ly]" reserve the right to translate the cinematized work to Naylor, as required to overcome the presumption of transfer in Article 99.

But even if HIG were correct that the ████████████ is an "express stipulation" that translation rights did *not* transfer, HIG would lack standing because it has failed to allege those same rights were unfrozen and later transferred to HIG. HIG made the strategic decision to omit from its Complaint the details of the Naylor/Zip Agreement, including ██████████████████████████████ ████████ As a direct result of that strategic choice, HIG failed to allege that any rights were ever ████████ Therefore, regardless of the arguments HIG makes now, it has indisputably failed to allege that it acquired any of the ██████████ ████████████████████████ *See* Mot. at 13–14.

HIG proffers three proposed readings of the Naylor Zip Agreement under which, HIG says, (1) ████████████████ was an express stipulation to not transfer translation rights *and* (2) that same provision ████████ those same translation rights. The readings are implausible, at best.

*First*, HIG claims that the Naylor/Zip Agreement ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ which included rights to "elements like story and dialog." Opp. at 15. Netflix therefore "needed to get licenses to each bundle of elements" in order to translate #*Saraidta*. *Id.* at 16.

-9-
DEFENDANT NETFLIX, INC.'S REPLY I/S/O MOTION TO DISMISS

1   HIG made this argument out of whole cloth. HIG cites nothing in its
2   Complaint, nor any of the contracts incorporated into the Complaint, to support its
3   interpretation. Nor could it. The Complaint made no mention ▇▇▇▇▇▇▇▇▇▇▇▇
4   instead claiming (falsely) that HIG was the "owner of all rights to make … all
5   derivative non-Korean language versions *and other derivatives*, also[], and … *even*
6   *derivative rights to any subsequent Korean versions*." Compl. ¶ 19 (emphasis
7   added). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
8   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
9        The Naylor/Zip Agreement says that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
10  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
13  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ RJN Ex. B § 1(a). But under HIG's theory that Naylor
14  somehow transferred no rights in his Original Script, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
15  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ were utterly worthless. HIG's position is that things
16  like ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id.*, would be "derivative works based on the
17  Script" and "Zip and Perspective had only the right to the new elements of the
18  movie," Opp. 15; see also Opp. 6 (arguing hypothetical "unauthorized version" of
19  James Bond movie would infringe the rights in the underlying novel). If HIG's
20  interpretation of the Agreement is correct (and it very much is not) then the
21  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ was worthless
22  because those were all derivative works of the script—and, HIG says, Naylor
23  retained all rights to *all* derivative works of the script. In other words, under HIG's
24  reading, Naylor both retained *all* derivative rights and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ There is no basis in the language of the Agreement, or in
26  reason, to adopt that interpretation.
27        *Second*, HIG claims ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
28  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Opp. 16.  But that is beside the point.
2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4 ▓▓▓▓▓▓▓  RJN Ex. B § 1(a).  That provision would be meaningless if the parties
5 were free to assign their rights away unilaterally without any ▓▓▓▓▓▓▓▓
6   *Third*, HIG points to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓  Opp. 13.  But that argument makes no sense.  ▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Moreover,
13 the right Naylor retained was to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ throughout the world,
14 making clear that Naylor reserved the right to create a *new* English-language film,
15 not to translate *#Saraitda*.  RJN Ex. B § 1(a).  Indeed, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  RJN Ex. B § 1.  The only
19 plausible reading of that sentence is that Naylor reserved all rights to make a new
20 movie, in English, based on the *Devour* script, and did so ▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓—i.e., to the extent that any elements of the new English language movie
22 could be considered derivative of *#Saraidta*, Naylor was retaining those rights
23 insofar as necessary to make a new English language movie.
24   HIG also spills substantial ink in an attempt to reframe Netflix's Motion into
25 an extensive argument about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
26 ▓▓▓▓▓▓▓▓▓▓▓▓▓, pointing at various contractual provisions raised by Netflix and
27 then claiming that the understanding of those provisions would implicate "a fact
28 question" that cannot be resolved on a motion to dismiss.  *See, e.g.*, Opp. at 12.  But

-11-

1  the Motion simply does not make that argument.  Netflix's argument is
2  straightforward:  Article 99's presumption of transfer applies and ends any claim
3  HIG might have against Netflix for the translation of *#Saraitda*.  Netflix cited
4  further provisions in the Naylor/Zip Agreement as additional evidence that the
5  parties to that Agreement did *not* "expressly stipulate[]" to reverse the presumption
6  of Article 99—because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  If those provisions did
8  not exist at all, HIG still would have no evidence that Naylor and Zip expressly
9  stipulated to reverse that presumption.  The fact they do exist—and that there is no
10  express stipulation—is just further confirmation that the translation right was
11  conveyed by operation of Article 99.  *See* Mot. 10–11.

           **4.**      **Any Amendment Would Be Futile**

13        HIG has had ample opportunity to explain why the Korean translation
14  presumption should not apply here, but it has failed to do so.  As a result, it cannot
15  plausibly allege that it has standing, and so leave to amend should be denied.  *See,*
16  *e.g.*, *Pizzorno v. Draper*, No. 17-00182-AB, 2017 WL 4712071, at *9 (C.D. Cal.
17  July 7, 2017) (noting that a court "may deny leave to amend if the proposed
18  amendment is futile or would be subject to dismissal").

19      **B.**    <u>**HIG's Opposition Confirms That, If The Complaint Is Not**
20            **Dismissed Under Rule 12(b)(6), It Should Be Dismissed For Forum**
          **Non Conveniens Or Under Rule 19(b)**</u>

21        Netflix's forum non conveniens and failure to join arguments depend in part
22  on whether Perspective can be served and whether the Korean Defendants
23  (Perspective, Zip and Kakao) are amenable to jurisdiction in this Court.  As noted,
24  HIG has not to date agreed continue the hearing on Netflix's Motion, but the parties
25  are continuing to discuss.  If HIG does not agree, Netflix will file a motion with the
26  Court seeking a continuance.  *Supra* p. 3 & n.1.

### 1. Both Private And Public Factors Favor Dismissal For Forum Non-Conveniens

HIG does not contest that Korea provides an adequate alternative forum for this dispute. Opp. at 17–21. The only question that remains is whether the balance of private and public factors favors dismissal.

The private factors clearly favor dismissal. As HIG's own Opposition makes clear, a primary dispute in this case concerns whether the Naylor/Zip Agreement transferred translations rights to the Korean Producers pursuant to Korean law, froze those translations rights, or expressly reserved those rights to Naylor. If, as HIG claims, further factual development is necessary to resolve this case, both sides will be significantly prejudiced by the absence of the Korean Defendants, and in particular, the Korean Producers, who negotiated the initial contract from which all parties derive their rights.[3] Neither HIG nor Netflix was a party to that agreement, and HIG identifies only one California witness that it contends has knowledge related to that agreement. Opp. at 17.

HIG also identifies a handful of witnesses that might have knowledge of Naylor's agreement *with HIG*. But as the briefs on this Motion make clear, the agreement that matters for this dispute is the Naylor/Zip Agreement—and all witnesses on one side of that agreement are in Korea.

HIG's suggestion that the public interest weighs in favor of keeping the case in the United States because it concerns "U.S. copyright law, which this Court has both the interest and expertise in interpreting" is meritless. Opp. at 19. The Ninth Circuit has already considered and rejected that argument. *See Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 700–03 (9th Cir. 1995) ("If our courts can

---

[3] Although HIG continues to argue that Perspective is "based in Los Angeles," Opp. 18, that assertion is belied by the fact HIG has to date failed to serve Perspective, nearly four months after filing the Complaint.

entertain actions under the copyright laws of foreign nations, we see no reason why the High Court of Singapore is incapable of doing the same if need be.").

### 2. The Korean Defendants And Lotte Entertainment Are Indispensable Parties Because HIG Is Seeking To Invalidate Their Contractual Rights

If the Korean Defendants cannot be served or subjected to the Court's jurisdiction, the Court should dismiss for failure to join indispensable parties. HIG spills much ink arguing that the Korean Defendants (and Lotte Entertainment, which is not even named as defendant) are not indispensable because they are jointly liable and therefore HIG may sue one or all of those entities. Opp. 21–22. But Netflix's argument is *not* about joint liability. Instead, it is that the absence of the Korean Defendants and Lotte will "impair or impede [their] ability to protect [their] interest[s]." Fed. R. Civ. P. 19(a)(1)(B). The entirety of HIG's Complaint is based on HIG's own strained reading of the Naylor/Zip Agreement (which HIG says Netflix lacks standing to interpret). From that reading, HIG concludes that Zip and Perspective had no right to translate *#Saraitda* and therefore no ability to grant that right to Lotte which, in turn, had no right to grant Netflix ███████████ ███████████████████████████████████████████ ███████████████████ Compl. ¶ 28; *see also* RJN Ex. F at 2. HIG is purporting to interpret the Naylor/Zip Agreement (to which it is not a party) in order to invalidate agreements between Zip, Perspective, Lotte and Netflix. Rule 19 requires that those entities be joined so that they may exercise their "ability to protect the interest" in their own rights. Fed. R. Civ. P. 19(a)(1)(B).

*Gilliam v. ABC*, 538 F.2d 14, 25 (2d Cir. 1976) does not help HIG. There, the court found that the non-parties were not indispensable to plaintiff's copyright infringement lawsuit, because their copyright ownership was not at all implicated by

plaintiff's claims. 538 F.2d at 26.⁴ Here, HIG does not dispute that absent parties' rights will be invalidated by a ruling in its favor. *Cf. Vance v. Am. Soc'y of Composers*, 271 F.2d 204, 207–08 (8th Cir. 1959) (determining that non-party copyright owners were "manifestly indispensable" where it was apparent that the object of plaintiff's suit was to invalidate their copyright interests).

### III. CONCLUSION

For the reasons set forth above and in its Motion to Dismiss, Netflix respectfully requests that the Court dismiss HIG's Complaint.

DATED: March 11, 2022                    MUNGER, TOLLES & OLSON LLP

                                         By:    */s/ Kelly M. Klaus*
                                                KELLY M. KLAUS
                                                Attorneys for Netflix, Inc.

---

⁴ HIG's other cases similarly do not address a situation like the one here, where absent parties' rights would necessarily be invalidated by a ruling in favor of the plaintiff. *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 360 (2d Cir. 2000) did not, as HIG claims, "reverse dismissal of copyright infringement complaint." Opp. 22. It did reverse on a claim for injunctive relief, but quite clearly said that the "claims for damages in copyright and tort … are remanded for reconsideration" so that the "[w]hether the [trial] court denies or grants dismissal by reason of" an absent party, it could "explain its reasons." In *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1044 (D.C. Cir. 1981), the defendant argued that the absent party was indispensable because (1) defendant's alleged infringement was authorized by that party and (2) defendant "needs evidence from [the absent party] for a defense." Netflix makes neither argument here.