1  Peter R. Afrasiabi (SBN 193336)
   pafrasiabi@onellp.com
2  John Tehranian (Bar No. 211616)
   jtehranian@onellp.com
3  **ONE LLP**
   23 Corporate Plaza
4  Suite 150-105
   Newport Beach, CA  92660
5  Telephone: (949) 502-2870
   Facsimile: (949) 258-5081
6
7  **BAY ADVOCACY PLLC**
   Maximillian Amster (*Pro Hac Vice*)
   Samuel J Salario, Jr. (*Pro Hac Vice*)
8  1700 S. MacDill Avenue, Suite 300
   Tampa, Florida 33629
9
10 Attorneys for Plaintiff,
   Hollywood Innovations Group, LLC
11

12                **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14                    **WESTERN DIVISION**

| | |
|---|---|
| 15  HOLLYWOOD INNOVATIONS<br>GROUP, LLC, a California corporation, | Case No. 2:21-cv-09423-TJH(GJSx)<br>Hon. Terry J. Hatter, Jr |
| 16              Plaintiff, | |
| 17     v. | **PLAINTIFF'S MEMORANDUM**<br>**OF POINTS AND AUTHORITIES**<br>**IN SUPPORT OF ITS** |
| 18  NETFLIX, INC., a Delaware<br>corporation; ZIP CINEMA CO., LTD., a | **OPPOSITION TO DEFENDANTS**<br>**ZIP CINEMA CO., LTD. AND** |
| 19  South Korea corporation;<br>PERSPECTIVE PICTURES CO., | **PERSPECTIVE PICTURES CO.,**<br>**LTD. MOTION TO DISMISS** |
| 20  LTD.,a South Korea corporation; and<br>DOES 1-10, inclusive, | **COMPLAINT** |
| 21              Defendants. | |
| 22  | REDACTED VERSION OF |
| 23  | DOCUMENT PROPOSED TO BE |
| 24  | FILED UNDER SEAL |
| 25  | |

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2  I.   INTRODUCTION ....................................................................................... 1

3  II.   BACKGROUND ........................................................................................ 2

4       A.   HIG's English Language Rights Compared to Defendants' Limited
             Korean Language Only Rights. ......................................................... 2

5       B.   Defendants' Dub-and-Release Scheme .............................................. 2

6       C.   Defendants Start Targeting Plaintiff in LA ....................................... 4
        D.   The Infringing Film's Release Destroys Plaintiff's Market ............... 5

7       E.   Summary of Zip and Perspective's Contacts with California ............. 6

8  III.   ARGUMENT .............................................................................................. 7

9       A.   Jurisdiction Exists Due to Forum Contacts ...................................... 7
             i.   Specific Jurisdiction Under the Purposeful Availment Test. ...... 9

10               1.   Perspective Purposefully Directs Activities to California. 9

11                    a.  Perspective Committed an Intentional Act. ....................... 9

12                    b.  Perspective Expressly Targeted Residents........................ 10

13           (1)   Seeking the Benefits of California............................................. 10

14           (2)   There is no "it-was-aspirational" exception ............................... 12

15           (3)   Advertising claims suffice ........................................................ 12

16           (4)   The emails are direct to plaintiff and were the predicate acts in

17                 the infringement scheme........................................................... 14

18           (5)   Perspective has a shadow entity registered here by the same alter

19                 ego, Ms. Kim ............................................................................ 15

20                    c.  Perspective Knowingly Caused California Harm. ........... 16
                 2.   Claims Relate to Perspective's Activities in California... 17

21               3.   Personal Jurisdiction in California Is Reasonable............ 18

22               4.   Perspective's Contacts Are Attributed to Zip ................. 19
             ii.  Specific Personal Jurisdiction: Stream of Commerce. .............. 20

23      B.   Summary Conclusion.................................................................... 24

24  IV.   Plaintiff's Request for Discovery. ............................................................ 25

25  V.   CONCLUSION ......................................................................................... 25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
   874 F.3d 1064 (9th Cir. 2017).......................................................................... 8, 18

*Bensmiller v. E.I. Dupont Nemours & Co.*,
   47 F.3d 79 (2d Cir. 1995) ....................................................................................... 19

*In re Boon Global, Ltd.*,
   923 F.3d 643 (9th Cir. 2019) ................................................................................... 7

*Boschetto v. Hansing*,
   539 F.3d 1011 (9th Cir. 2008) ................................................................................. 7

*Boyd v. Bevilacqua*,
   55 Cal. Rptr. 610 (Cal. Ct. App. 1966) ............................................................... 20

*Bristol-Myers Squibb Co. v. Superior Ct. of California*,
   137 S. Ct. 1773 (2017)........................................................................................... 23

*Care, Ltd. v. Insta-Mix, Inc.*,
   438 F.3d 465 (5th Cir. 2006) .................................................................................... 8

*Certain Underwriters at Lloyd's v. Garmin Int'l, Inc.*,
   No. 11-2426 EFM-GLR, 2012 WL 1158849, at *4 (D. Kan. Apr. 6,
   2012).......................................................................................................................... 20

*Core-Vent Corp. v. Nobel Indus. AB*,
   11 F.3d 1482 (9th Cir. 1993) .................................................................................. 18

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014)................................................................................................. 7

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
   290 F.3d 42 (1st Cir. 2002) ..................................................................................... 19

*Ford Motor Co. v. Mont. Eighth Jud. Dist.*,
   141 S. Ct. 1017 (2021)....................................................................................... 8, 17

*Grell v. Laci Le Beau Corp.*,
   87 Cal. Rptr. 2d 358 (Cal. Ct. App. 1999) ......................................................... 16

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003) .................................................................................. 7

ii

*Hill v. Shell Oil Co.*,
    149 F. Supp. 2d 416 (N.D. Ill. 2001)....................................................................20

*In-N-Out Burgers v. Basso*,
    No. CV 05-1231 ER, 2005 WL 5337562 (C.D. Cal. June 27, 2005)...........13, 14

*Isbell v. DM Records, Inc.*,
    No. 3:02-CV-1408-G, 2004 WL 1243153 (N.D. Tex. June 4, 2004)......8, 20, 21

*Kellytoy Worldwide Inc. v. Jay at Play Int'l Hong Kong Ltd.*,
    No. 19-cv-07831, 2019 WL 8064196 (C.D. Cal. Dec. 5, 2019)............22, 23, 24

*LNS Enterprises LLC v. Continental Motors, Inc.*,
    22 F.4th 852 (9th Cir. 2022)..................................................................7, 14, 25

*LNS Enters. LLC v. Cont'l Motors, Inc.*,
    22 F.4th 856 (9th Cir. 2022)..................................................................13, 14

*Love v. Associated Newspapers, Ltd.*,
    611 F.3d 601 (9th Cir. 2010)........................................................................7

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011)..................................................................13, 14

*Ochoa v. J.B. Martin & Sons Farms*,
    287 F.3d 1182 (9th Cir. 2002)........................................................................15

*Philpot v. Balt. Post-Examiner*,
    No. 3:20-cv-00872-H-MSB, 2020 WL 6826488 (S.D. Cal. Sept. 10,
    2020).................................................................................................8, 16, 17

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015)........................................................................9

*Rosen v. Masterpiece Mktg. Grp., LLC*,
    No. CV15-06629 SJO, 2015 WL 12860487 (C.D. Cal. Dec. 23,
    2015).................................................................................................13, 14

*Sherri Hill v. Amarra*,
    No. 1:20-CV-350-LY, 2020 WL 10056075 (W.D. Tex. Dec. 2,
    2020).................................................................................................8

*Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*,
    859 N.W.2d 182 (Iowa 2015)................................................................*passim*

*Turpin v. Mori Seiki Co.*,
    56 F. Supp. 2d 121 (D. Mass. 1999)..............................................................*passim*

**Statutes**

CAL. CIV. PROC. CODE §§ 416.10, 416.20 ...............................................................16

**Other Authorities**

Berne Convention for the Protection of Literary and Artistic Works art.
    5, Sept. 28, 1979 ("Berne Convention") ......................................................19, 24

## I.      INTRODUCTION

Defendants are movie producers who tell the world to this day that they are Los Angeles-based. Defendant Perspective Pictures and its owner, Ms. Kim, even registered their "Perspective Pictures" company in California. As movie producers, Defendants had the limited right to make only a Korean language version of a script Plaintiff owns the copyright to. Plaintiff Hollywood Innovations Group (HIG) meanwhile owned the rest of all rights and was making the English language film version of the script. The Korean market is small, of course, so Defendants sought illicit profits by beating Plaintiff to the English-langue market by contracting to deliver their Korean language only film to Netflix so that a new version of what should have been a Korean langage-only film could secure new actors and then be dubbed into English and released on Netflix. In the process, they infringed HIG's copyrights in the U.S. and this forum.

To succeed in this dub-and-release infringement scheme, Defendants, who already advertise (in English) that they are LA based on their website and social media, further reached into this forum to forum resident HIG with US-based email addresses and made phone calls to HIG from avowed LA-based agents, all as part of their dub-and-release infringement scheme so as to learn Plaintiff HIG's schedule for its movie release and streaming plans. Defendants even represented that their LA-agent, Esther Young, could communicate on their behalf. The email and phone contacts all served Defendants' (successful) attempts to race to streaming service Netflix for the release of their unlawful infringing English language film and usurp the market for Plaintiff's lawful version. Indeed, before Defendants even finished making their film, ███████████████████████████████████ ████████████████—all to allow their Korean film to be dubbed into English and released on Netflix in California.

This is all to say: nothing is remotely offensive to any notion of fair play to require one who targets actions into this forum, takes the benefits of this forum,

advertises it is here, and transacts in this forum in this way (by utilizing it for commercial advantage with actual LA agents acting in LA for the avowed LA principal), to be asked to answer in Court here. And it is also to say this: the claim to this Court that Defendants are South Korean entities making Korean movies who never could imagine being in an American court because they just have nothing to do with America is a fabrication given the record evidence we now address.

## II.   BACKGROUND

### A.   HIG's English Language Rights Compared to Defendants' Limited Korean Language Only Rights.

This case centers on the original Script written by Matt Naylor. Compl. ¶ 3, 13, 14. On April 1, 2019, Naylor sold all of his rights to Rabih Aridi via a Literary Purchase Agreement (the "Nalor-Aridi Agreement"), *Id.* ¶ 16, through which he assigned to Aridi "all rights of every kind" in the Script for use "throughout the world," Dkt. 33-3 Recitals, § 1. That assignment expressly included all rights in the world and excluded only one thing: "those rights which are set forth" in a License Agreement dated July 18, 2018, between Naylor and two Korean movie producers, Zip Cinema and Perspective Pictures (the "Naylor-Zip Agreement"). *Id.* § 2. The Naylor-Zip Agreement gave the Korean producers one thing: the right ███████ ████████████████████████████████████████████████████████████ ████████████████ (the "Korean Picture"). Dkt. 33-2 § 1 (emphasis added).

Aridi assigned his rights to Devour LLC, which assigned these rights to HIG. Compl. ¶¶ 13, 17, 18. HIG thus owns the entire copyright in the Script with the exception of the right to make a single movie in Korean. *Id.* ¶ 18.

In the Spring of 2019, with its broad rights in the Script, HIG set about making *Alone*, its own production in English. *Id.* ¶¶ 13, 19–20. With Hollywood director Johnny Martin attached to direct, and Donald Sutherland and Tyler Posey in the two lead roles, HIG planned for an official release in October 2020, with plans for streaming deals and sequels. *Id.* ¶¶ 20–21, 36.

### B.   Defendants' Dub-and-Release Scheme

2

Defendant Perspective Pictures is owned by Ms. Kim. Kim Decl. ¶ 1. Its website advertising page show it is centered in Los Angeles as it expressly holds itself out as an LA movie production company. Afrasiabi Decl., Ex. 1. The website is also in English, not Korean, so the California-based residency claim appears legitimate to the world. *Id.* Ms. Kim is also registered a "Perspective Pictures" with the California Secretary of State. Afrasiabi Decl., Exs. 5 & 6.

In the Spring of 2019, Zip and Perspective already had their eyes set on an unlawful English language version for Netflix streaming release, as they contracted with Lotte in July 2019 (pre-film completion) to secure worldwide release *in any language* ███████████████████████. Jin Decl., Ex. A; Jin Decl. ¶ 5. While we do not have the entire Netflix-Lotte contract as Netflix has refused to produce it, ███████████████████████████ ████████████████████████████████████ ████. *See* "May 2020 Lotte-Netflix Agreement," Dkt. 30, Ex. F. Thus, to stream on Netflix, Zip/Perspective had to go through Lotte.

So, on July 3, 2019, Zip entered into an Agreement on Film Production, Investment, Distribution and Profit Distribution with Lotte Entertainment (the "Zip-Lotte Agreement"). Jin Decl., Ex. A; Jin Decl. ¶5. Through the Zip-Lotte Agreement, Zip conveyed its rights—*including those it did not have as the Zip-Lotte Agreement did not contain any limitations on the language that the film could be distributed in*—to Lotte, while remaining obligated to collaborate with the overseas distribution. Jin Decl., Ex. A, Art. 8 § 1; Art. 3 § 1.D., Art. 5 § 1.C.

Zip made this July 2019 assignment because, as the timeline shows, it intended to seek broad release of *non*-Korean language versions (instead of a limited Korean language release) via the world's leading platform for streaming release movies: California-based Netflix.

Meanwhile, oblivious to this growing intrigue, Plaintiff, who had secured its rights in Spring 2019, was by July 2019 underway in its English-language

3

1    production, which brings us back to the Defendants' forum-directed activities.

2         **C.    Defendants Start Targeting Plaintiff in LA**

3         Having entered an agreement in July 2019 to reach Netflix with no language

4    restrictions, in order to succeed in the dub-and-release scheme, Defendants needed

5    to beat Plaintiff to the market so that Defendants' English language film version of

6    the script would preempt Plaintiff's English language film. So, on October 27, 2019

7    (again after the date of the Perspective/Zip-Lotte Agreement), formal agents of

8    Perspective emailed into California to Plaintiff's *Alone* producers to ascertain details

9    about Plaintiff's production schedule. Compl. ¶ 24; Kim Decl., Ex. B at 39–40;

10   Jordan Decl. ¶ 3. The emails did not come from a foreign email address. To the

11   contrary, the domain name was expressly US based: @perspective-us.com. Kim

12   Decl., Ex. B. This domain name is not even registered through a Korean entity,

13   instead is registered in North America through the domain registrar tucows.com

14   where Defendants have shielded their registration information behind a Toronto-

15   based cloaking service. Afrasiabi Decl. ¶ 9.

16        When the recipient of those emails goes to the website <<

17   www.perspective.us.com>> they find an English language website claiming LA as

18   their home. Afrasiabi Decl., Ex. 1. The senders when searched present on the US

19   company LinkedIn's pages (in English) also claiming they are in LA. Afrasiabi

20   Decl., Exs. 3 & 4. Both Ms. Kim and Young had perspective.us email addresses.

21        The emails directed to LA-based HIG sought information on HIG's *Alone*'s

22   release date, ***streaming deals***, territories in which *Alone* was going to be streamed,

23   and wanted the producers to ***hold off streaming*** for six months after the release of

24   *#Alive*. Kim Decl., Ex. B at 38–40.

25        Anne Jordan, on behalf of the *Alone* producers, made clear that they were

26   under no obligation to provide that information or do any such thing, but that they

27   would do so if they had information to share. *Id.* at 37.

28        The emails persisted until March 2020, even when, sometimes, no response

4

was received on behalf of the *Alone* producers. Kim Decl., Ex. B. In all, Defendants sent **eight** emails, all constantly directed to LA about HIG's film production, all that read as a harangue constantly trying to pry into what Plaintiff was doing and its timing of a release. *Id.*

During this LA email campaign, one of Perspective's agents, Ms. Kim, included another of Perspective's claimed agents, Esther Young, in the emails to handle the communications expressly because she was in Los Angeles. Kim Decl, Ex. B at 32. Then, taking advantage of Young's residence in Los Angeles, Perspective's Young had phone calls with Ms. Jordan, while acting on behalf of Perspective. Jordan Decl. ¶ 3.

Then, starting in July 2020—just two months before Netflix's release of the dubbed and subtitled versions of *#Alive* and well after having licensed it to Lotte—Zip and Perspective used a new LA agent to continue their assault on HIG's rights. Specifically, LA resident Matt Naylor reached out on, apparently, Defendants' behalf to try to acquire potential acquisition of sequel and other derivative rights from HIG. Compl. ¶ 23. And Naylor, a California resident, introduced Anne Jordan to Chad Russo, a California attorney, to negotiate on behalf of Defendants the acquisition of derivative rights of *Alone*. Jordan Decl. ¶ 6. The potential acquisition was on behalf of Zip and Perspective, even though Mr. Russo sought to hide from Ms. Jordan the identity of the producers interested in acquiring the derivative rights (despite requests from Ms. Jordan). *Id.* ¶ 7.

But Plaintiff was not interested in granting any derivative rights so, despite this second round of LA entreats from LA agents of Defendants, done secretly to even try to avoid Plaintiff connecting it to their first set of rebuked contacts, Plaintiff kept its head down on its film production. *Id.* ¶ 8.

### D.    The Infringing Film's Release Destroys Plaintiff's Market

The Korean language movie, called *#Saraitda*, was released in Korea in June 2020, and quickly became a hit there. Complaint ¶¶ 23–24. By this time, HIG was in

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS ZIP CINEMA CO.. LTD. AND PERSPECTIVE PICTURES CO.. LTD. MOTION TO DISMISS COMPLAINT

post-production on its film for its Fall 2020 release. Jordan Decl. ¶ 5. Then, on September 8, 2020, Netflix suddenly released *#Saraidta* renamed with the English name *#Alive* and dubbed with new actors (and subtitled) from Korean into English and 30 other languages. *Id.* ¶ 32. This Netflix release of Zip/Perspective's *#Saraidta* was done via Netflix's ██████████████████████████████ ████████████████

When people watched the English-language *#Alive*, they watched a movie with an English name with all dialogue performed in English by new English-speaking actors who had been hired to be in the derivative work using advanced dubbing technologies that have revolutionized the film market. *See* Complaint ¶ 32.

Thus, when HIG released *Alone* in October 2020, *#Alive* had been widely viewed and *Alone*, literally derided as a knock-off of *#Alive,* saw its commercial prospects in the U.S. and with foreign audiences destroyed. *Id.* ¶¶ 34–36.

**E.    Summary of Zip and Perspective's Contacts with California**

As outlined above, Perspective's English language website expressly says that it is a "film and television production company based in Los Angeles and Seoul,[1]" and Perspective's emails from a claimed "US" domain address to HIG expressly state that the agent writing on behalf of the company was based in Los Angeles, Kim Decl., Ex. B at 32. Perspective's agents LinkedIn page—also in English not Korean—further claim LA as their home. Afrasiabi Decl., Exs. 3 & 4. Zip and Perspective started sending different LA agents to gather details of *Alone* on October 27, 2019, almost three months after the rights to *#Alive* had been transferred to Lotte Entertainment, and have inquired about the potential acquisition of sequel and derivative rights of *Alone* between July and September 2020. Perspective's other agents acting on their behalf for the very issue of derivative rights—the exact subject matter of this suit—were two LA residents, one an LA attorney. Jordan Decl. ¶¶ 6–7.

---

[1] Afrasiabi Decl., Ex. 1 (https://www.perspective-us.com/company).

1    They should not have had any interest in *Alone*'s release date if their focus

2    was only their Korean language film for South Korea. These facts, given the

3    timeline, show that the communications into California were not unrelated to the

4    dub-and-release scheme, but were, in fact, central to it so they could beat HIG to the

5    market. As co-producers of the movie and intentional ultimate distributors to

6    Netflix, Zip and Perspective's actions and contacts with California are attributed to

7    each other. As we now explain, both are subject to personal jurisdiction here.

8    **III.    ARGUMENT**

9        **A.    Jurisdiction Exists Due to Forum Contacts**

10        "Specific jurisdiction covers defendants that are less intimately connected

11    with a state, but have sufficient minimum contacts with the state that are relevant to

12    the lawsuit." *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 859

13    (9th Cir. 2022). Procedurally, "the plaintiff need only make prima facie showing of

14    jurisdiction to avoid the defendant's motion to dismiss" without an evidentiary

15    hearing. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122,

16    1129 (9th Cir. 2003). Furthermore, "[u]ncontroverted allegations in the complaint

17    must be taken as true, and conflicts over statements contained in affidavits ***must be***

18    ***resolved in [plaintiff's] favor***." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601,

19    608 (9th Cir. 2010) (emphasis added). *See also In re Boon Global, Ltd.*, 923 F.3d

20    643, 650 (9th Cir. 2019). Substantively, "[f]ederal courts ordinarily follow state law

21    in determining the bounds of their jurisdiction over persons[.]" *Daimler AG v.*

22    *Bauman*, 134 S. Ct. 746, 753 (2014). Because "California's long-arm statute is co-

23    extensive with federal standards," *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th

24    Cir. 2008), due process requires only minimum contacts with the forum state to

25    permit the Court to exercise either of the two forms of personal jurisdiction: general

26    jurisdiction or specific jurisdiction. *Id.* at 1016.

27        The Ninth Circuit requires a three-step test to determine whether a foreign

28    defendant is subject to specific jurisdiction within a forum. First, "the defendant

7

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS ZIP
CINEMA CO.. LTD. AND PERSPECTIVE PICTURES CO.. LTD. MOTION TO DISMISS COMPLAINT**

must either 'purposefully direct his activities' towards the forum 'or purposefully avail himself of the privileges of conducting activities in the forum.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). Second, the claim must "arise out of or relate to the defendant's forum-related activities." *Id.* And third, "the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable." *Id.* "[A] strict causal relationship between the defendant's in-state activity and the litigation" is not required. *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 141 S. Ct. 1017, 1026 (2021).

In tort cases, the first prong is determined by the "purposeful direction test." *Axiom Foods, Inc.*, 874 F.3d at 1069. Under this test, "[t]he defendant must have '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Id.* "Copyright infringement actions sound in tort and are therefore assessed under the purposeful direction analysis." *Philpot v. Balt. Post-Examiner*, No. 3:20-cv-00872-H-MSB, 2020 WL 6826488, at *3 (S.D. Cal. Sept. 10, 2020) (citing *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011)).

In copyright infringement cases, courts have also used the "stream of commerce" analysis to determine specific personal jurisdiction. *E.g., Luv n' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006); *Sherri Hill v. Amarra*, No. 1:20-CV-350-LY, 2020 WL 10056075, at *6 (W.D. Tex. Dec. 2, 2020); *Isbell v. DM Records, Inc.*, No. 3:02-CV-1408-G, 2004 WL 1243153, at *8 (N.D. Tex. June 4, 2004). Under this test, the plaintiff must show that (1) the defendant placed an allegedly infringing work into the stream of commerce, expecting that the work would enter the forum State, and (2) "there is a connection between the plaintiff's injuries, the forum state, and the defendant delivering the infringing work into the stream of commerce." *Isbell*, 2004 WL 1243153, at *8.

We address both purposeful availment and stream of commerce in the sections below, i and ii respectively.

### i.     Specific Jurisdiction Under the Purposeful Availment Test.

Perspective and Zip are subject to specific personal jurisdiction here because they have minimum contacts with the State. Perspective has purposefully directed its activities to California residents, HIG's claims are related to Perspective's activities in California, and the exercise of jurisdiction in California over Perspective is reasonable. In addition, Perspective has committed intentional acts, expressly aimed at California, while knowing that the harm to HIG was likely to be suffered in California. Furthermore, Perspective contacts with California can be attributed to Zip as partners in a joint venture.

### 1.     Perspective Purposefully Directs Activities to California.

Under the "purposeful direction" analysis, Perspective has directed its activities to California by committing intentional acts, expressly aimed at California residents with the knowlege that HIG's harm was likely to be suffered in California.

### a.     Perspective Committed an Intentional Act.

The intentional act requirement "is essentially the same as in the context of intentional torts; namely, the defendant must act with the 'intent to perform an actual, physical act in the real world." *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015). The only requirement is volition and is easily satisfied. *Id.*

Perspective has committed intentional acts for purposes of specific personal jurisdiction. Perspective tried to systematically obtain information from HIG "to race to complete the Korean film and then unlawfully dub it into English and other languages to reach a more lucrative market and maximize its profits." Compl. ¶ 24. Perspective claims that these efforts to obtain information are typical industry inquiries. Dkt. 78 10:9. However, these efforts coupled with the fact that the dubbed and subtitled versions of *#Alive* were released a few months after leads to one conclusion: they had to market the infringing motion picture prior to the completion of HIG's movie production in order to take full advantage of this illicit opportunity. Compl. ¶ 24. These harassing intents to obtain information where part of a

systematic copyright infringement scheme. As such, there is no room for an argument that Perspective has not committed an intentional act.

### b.   Perspective Expressly Targeted Residents.

Perspective's root argument is that its contacts were "aspirational" and so do not count. Not so. A defendant that explicitly holds itself "out to the public as ready, willing and able to do business" in a state is purposefully availing itself of the privileges of conducting activities within the forum. *Turpin v. Mori Seiki Co.*, 56 F. Supp. 2d 121, 127 (D. Mass. 1999). A defendant purposefully directs its activities to a forum even if it falsely represents that is present in the forum for competitive marketing purposes. *Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 196 (Iowa 2015) ("Any party that claims to operate within a forum state should expect to be haled into court there, whether or not the claims are true.").

### (1)   Seeking the Benefits of California

In *Turpin*, one of the plaintiffs suffered workplace injuries while using an engine lathe manufactured by a Japanese corporation. *Turpin*, 56 F. Supp. 2d at 123. He and his wife brought action against the Japanese defendant and its wholly owned American subsidiary. *Id.* The court originally dismissed the complaint against the Japanese defendant for lack of personal jurisdiction, but the plaintiffs filed a motion to reconsider its prior ruling. *Id.* In analyzing Massachusetts' long arm statute under the Due Process Clause of the United States Constitution, the court stated that "a court must evaluate 'whether the defendant purposefully established minimum contacts in the forum State.'" *Id.* at 125 (citing U.S. Supreme Court precedent). The court found that the Japanese defendant had purposefully availed itself of the privilege of conducting activities within Massachusetts because the Japanese defendant's conduct indicated an "intent or purpose to serve the market in the forum." *Id.* at 127.

Evidence of this conduct was marketing material, printed by the Japanese defendant, which represented that it had an office in Massachusetts. *Id.* This

representation predated the litigation and was still on its marketing material at the time of the litigation (like this case). *Id.* The defendant (like Defendants here) argued that it did not actually have an office in Massachusetts and that the marketing material "was merely designating an authorized dealer of office." *Id.*

The court, however, rejected this argument. "The defendant [could] explain the facts, but it [could not] change them." *Id.* Thus, whether the Japanese defendant was

> designating its own facility or the facility of an intermediary or subsidiary, the fact remains that it was explicitly holding itself out to the public as ready, willing and able to do business in Boston. It is difficult to imagine a more intentional or deliberate effort to 'serve the market in the forum' of the Commonwealth.

*Id.* The court thus found that the defendant had purposefully availed itself in Massachusetts. *Id.*

Similarly, in *Sioux Pharm*, the Supreme Court of Iowa addressed whether a nonresident defendant that stated on its website that it had a manufacturing facility in Iowa was subject to personal jurisdiction in that forum. *Sioux Pharm, Inc.*, 859 N.W.2d at 186. The plaintiff, an Iowa corporation, sued defendant, a New Jersey corporation, over several tort claims. *Id.* at 187. The defendant did not have an office, agent, or employees in Iowa. *Id.* Moreover, the defendant had never been registered to do business in Iowa, it did not own nor lease any premises in the State, it did not own a bank account in the State, and it had never specifically directed advertising at Iowa markets or sold its product to anyone in Iowa, except for a sample purchased by the plaintiff. *Id.*.

But the Supreme Court held that since defendant held itself out as having offices in Iowa, it was subject to personal jurisdiction. *Id.* Like here, defendant argued that it had listed the building address as its own only for marketing purposes. *Id.* at 196. The Court held that defendant's "website statement, by holding itself out as operating its own Iowa manufacturing facility, supports specific jurisdiction" notwithstanding that, in reality, that facility was owned by someone else. *Id.* The

11

defendant had "***falsely touted Iowa roots to enhance its sales***." *Id.* Therefore, **"[a]ny *party that claims to operate within a forum state should expect to be haled into court there, whether or not the claims are true*."** *Id.* (emphasis added).

This case is the same. Perspective has expressly directed its activities at residents of California by representing that it is present in California. Perspective's website expressly states that "Perspective Pictures is a film and television production company based in Los Angeles."[2] Compl. ¶ 6. In addition, Rommy Kim, who holds herself out as the CEO and producer at Perspective Pictures on the professional network LinkedIn,[3] and Esther Young, who claims on LinkedIn to be an associate producer at Perspective Pictures, each claim to reside in Los Angeles[4].

### (2)    There is no "it-was-aspirational" exception

Perspective argues that "the references to a Los Angeles presence on Perspective's website . . . are entirely aspirational" and that Perspective hopes to establish a presence in Los Angeles [although] it has not done so to date." Dkt. 78 10:19–22. However, this argument is meritless. As the court in *Turpin* stated, Perspective "can explain the facts, but it can't change them." *Turpin*, 56 F. Supp. 2d at 127; *Sioux Pharm, Inc.*, 859 N.W.2d at 196. Once a party holds itself out as being in the forum, then that act alone has been one of availing oneself of the forum and one can and should expect to be haled into Court there. If a person wants nothing to do with California, then they should act that way, but they cannot derive the benefits that come from claiming a California presence and then claim the opposite when the shoe is on the other foot.

### (3)    Advertising claims suffice

Perspective's website clearly says, "based in Los Angeles and Seoul." It does not say "based in Seoul and soon to be in Los Angeles." And an important aspect of this statement is that Los Angeles appears before Seoul in the sentence, thus making

---

[2] Afrasiabi Decl., Ex. 1 (https://www.perspective-us.com/company).
[3] Afrasiabi Decl., Ex. 3 (https://www.linkedin.com/in/rommy-kim-45993921).
[4] Afrasiabi Decl., Ex. 4 (https://www.linkedin.com/in/esther-young-974714105).

12

sure that the reader catches the message that Perspective is based in Los Angeles. This is of import as Perspective is a film production company looking to exploit movie releases and California (Hollywood in this District, no less) is the planet's epicenter for the movie business. *E.g.*, *Mavrix*, 647 F.3d at 1229–30 (holding that a defendant was subject to personal jurisdiction where it operated a website to exploit the California market "with a specific focus on the California-centered celebrity and entertainment industries."). Just like *Mavrix*, here Defendants have operated their advertising campaigns (even aside from their directed contacts to Plaintiff) to reach the Hollywood film market, just as in *Mavrix* the defendants' advertising was built around celebrity content of which the Court noted California was also the epicenter.

Regardless of whether Defendants lied purely for competitive marketing purposes, Perspective is publicly holding out itself as based in Los Angeles. Indeed, even contending that the claim is for competitive marketing purposes amounts to far more availment than in *Turpin* or *Sioux Falls* anyway. After all, why should California entities who pay taxes here, compete here, and abide by the laws here be subjected to competition by companies who get the same playing field (telling their Hollywood-movie-centric audience they are California centered too), but then pay none of the costs (like answering in court here for violations of law here)? *See, e.g., Mavrix*, 647 F.3d at 1229–30; *Rosen v. Masterpiece Mktg. Grp., LLC*, No. CV15-06629 SJO, 2015 WL 12860487, at *9 (C.D. Cal. Dec. 23, 2015) (finding personal jurisdiction based in part on the fact that the defendant "sought out product and customer bases of California residents"); *In-N-Out Burgers v. Basso*, No. CV 05-1231 ER, 2005 WL 5337562, at *2 (C.D. Cal. June 27, 2005) (personal jurisdiction where the defendant targeted California specifically by indicating that it had two locations "coming soon," in California, thereby attracting customers in California).

Defendants seek to skirt this law by citing to *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 856, 863 (9th Cir. 2022), which held that the listing on a website of repair centers in Arizona was insufficient to subject the defendant to

jurisdiction in Arizona in a plane crash case. The Court expressly held that, because defendants had not deployed any marketing strategy towards Arizona residents, it had not entered the forum. *Id.* at 862-63. *LNS* thus is not a case of express and knowing marketing into a State to secure commercial benefits and it casts no shadow over *In-N-Out, Rosen, Mavrix, Turpin or Sioux Falls.*

If *In-N-Out's* "coming soon" was enough to target California and reasonably expect to be in court here and *Rosen's* acts to target Californian product bases was also enough, then the active claims here more than suffice. From *Mavrix* to *Rosen/In-N-Out* or *Turpin* to *Sioux*, the law's line is clear: if you, by advertisement or affirmative conduct, insert yourself into a forum to get the benefits of that forum, then you submit to the forum for grievances related to those claims.

### (4)    The emails are direct to plaintiff and were the predicate acts in the infringement scheme

It's not just general advertising related to film, though. Perspective targeted Plaintiff about the film, derivative rights and release date for streaming—the very subject matter of this action. Specifically, Young and Kim emailed Plaintiff in California on the subject matter of the film production and specifically represented that Young, the agent of Perspective with a perspective-us.com email address, resided in Los Angeles. Kim Decl., Ex. B at 32. Young was asked to contact HIG on behalf of Perspective because she was then living in Los Angeles. Kim Decl. ¶ 6. This email served to ascertain the status of plaintiff's film release, all so Defendants could dub-and-release and steal the pole position on an English language release of the movie in this very forum.

Thus, this was an actual specific representation made to the forum Plaintiff by Defendant, purporting to be in the forum too, about the subject matter of the film production—its status and release date which Defendants were looking, we now know, to upend with their dub-and-release infringement plan. Young was acting on behalf of Perspective, more specifically as an agent. The fact that Young—a claimed

California resident—was contacting HIG with a Perspective email address on behalf of Perspective to advance Perspective's infringing scheme, and while taking advantage of Young's residence in California, is enough to subject Perspective to jurisdiction in this forum. *See Ochoa v. J.B. Martin & Sons Farms*, 287 F.3d 1182, 1189 (9th Cir. 2002) ("it is not only defendant's activities in the forum, but also actions relevant to the transaction by an agent on defendant's behalf, which support personal jurisdiction.").

But Perspective's intrusion into the forum through Young was not just via email. Jordan Decl. ¶ 3. Defendants' motion conveniently ignore that Young had phone conversations with Ms. Jordan (while, apparently, being in Los Angeles, or otherwise not representing that she was in Korea), in which she spoke at all times as if she had authority to discuss issues on behalf of Perspective. Jordan Decl. ¶ 3. The fact that Perspective now seeks to portray Young as only a "friend" is extreme lily gilding; Esther had a **perspective-us.com** email address herself, further giving actual and apparent authority as an agent, not just a friend. Kim Decl., Ex. B at 32.; *see* Jordan Decl. ¶ 3. Since when do non-agent friends just doing a favor for a company also have an email address at the company? Anyway, friends can act as agents, indeed regularly do obviously. A party cannot avail themselves of a forum, claim to be in that forum, hold themselves out to the world as doing business and being centered in the forum, direct tortious conduct at the Plaintiff into the forum, and then claim that their contacts do not count with "friend" constructs.

### (5) Perspective has a shadow entity registered here by the same alter ego, Ms. Kim

Perspective claims in its "aspirational" construct to this Court that it "hopes to establish a presence in Los Angeles [although] it has not done so to date," Dkt. 78 10:19–22, and that it "is not now and never has been registered to do business in the State of California," Kim Decl. ¶ 2.

The California Secretary of State would be surprised to hear that Perspective has never been registered here. The same Saerom Kim who is behind Perspective Pictures also registered her "Perspective Pictures" company in California in July 2014. Afrasiabi Decl., Exs. 5 & 6. She then apparently chose to quit paying California the fees owed, but never formally dissolved. As a matter of law, of course, suspended companies may still transact in litigation in the state until they are formally dissolved. *See* CAL. CIV. PROC. CODE §§ 416.10, 416.20; *Grell v. Laci Le Beau Corp.*, 87 Cal. Rptr. 2d 358, 362–63 (Cal. Ct. App. 1999) ("A suspended corporation may be sued, and service of process upon a corporation is effected in the same manner as service upon a corporation that is not suspended.").

This, too, shows not that Perspective Pictures, as with its emails and website and LinkedIn, has actually in fact availed itself of California holding itself out as "Perspective Pictures" to conduct California business by registering to so do. As a matter of law, the very act of forming a juridical existence here necessarily constitutes a consent to jurisdiction. Thus, the motion's claim that it is simply an alien entity, stunned to be haled to California, is as fictional as the movies Defendants produce.

Perspective cannot have it both ways: it cannot register and/or advertise/claim to be present in California to attract California customers, use LA agents to target a forum resident on the subject matter here, and then claim it is not present in the State to evade the consequences of those actions. Thus, the first prong is satisfied.

### c.    Perspective Knowingly Caused California Harm.

In *Philpot*, the Southern District of California found that, where "copyright work was publicly displayed and viewed by residents of California," the harm was suffered in California. *Philpot*, 2020 WL 6826488, at *4. The court stated that "the 'brunt' of the harm need not be suffered in the forum state. *Id.* If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Id.* Furthermore, the court

1   added that "[t]he economic loss caused by the intentional infringement of a

2   plaintiff's copyright is foreseeable." *Id.*

3      Here, the harm was directly suffered here in California. HIG is a corporation

4   existing under the laws of California and with its principal place of business in Los

5   Angeles, California. Compl. ¶ 7. The harm caused by the infringement includes

6   harm to HIG's business reputation and goodwill (needed to make other films and get

7   people to support those endeavors), and decreased business and profits, all of which

8   are suffered in California. Per Perspective's own evidence, it knew that HIG is

9   located in California and that is why Perspective's local associate in Los Angeles

10  handled all the communications with HIG. Kim Decl. ¶ 6. Therefore, Perspective

11  caused harm that it knew it was likely, if not certain, to be suffered in California.

12          **2.     Claims Relate to Perspective's Activities in California.**

13     In *Turpin*, the district court found that "relatedness [was] not a seriously

14  debatable issue." *Turpin*, 56 F. Supp. at 126. The issue was rather straightforward

15  because the defendant's contact with the State were related to its products, the

16  plaintiff alleged to have been injured by one of those products, and thus there was

17  no incongruity in the relationship between the defendant's contacts and the tort. *Id.*

18     Here, HIG is claiming copyright infringement of the Script. HIG expressly

19  alleges that Perspective "repeatedly emailed and called the director and producers of

20  *Alone* in California to ascertain various details about the American production."

21  Compl. ¶ 24; Kim Decl., Ex. B. The Complaint further alleges that Perspective

22  "duplicitously intended to race to complete their Korean film and then unlawfully

23  dub it into English and other languages to reach a more lucrative market and

24  maximize their profits." *Id.* Per Perspective's own evidence, these emails and calls

25  came from Esther Young and Rommy Kim, which, as shown *supra*, claim to live in

26  Los Angeles, were done on behalf of Perspective that itself claims to be based in

27  Los Angeles. These activities in Los Angeles are closely and logically related to

28  HIG's claim for infringement. And, as the U.S. Supreme Court held in *Ford*,

causation is not necessary because a relationship between the forum activities and the litigation is all that is required. That is easily met here as discussed above.

### 3.     Personal Jurisdiction in California Is Reasonable.

Once the plaintiff has established that the defendant has minimum contacts with the forum, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable.'" *Axiom Foods*, 874 F.3d at 1068–69 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)). Defendants cite the multi-factor test:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. None of the factors is dispositive in itself.

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993).

Perspective has not presented a compelling case that the exercise of personal jurisdiction over it would not be reasonable. On factor one, Perspective's website and LinkedIn advertising statements that it is based in Los Angeles, is sufficient to balance the first two factors in favor of exercising jurisdiction in California. "Any party that claims to operate within a forum state should expect to be haled into court there, whether or not the claims are true." *Sioux Pharm, Inc.*, 859 N.W.2d at 196. Perspective has purposefully availed itself of the privileges of conducting activities in California by claiming agents are here and by using LA agents to target a forum resident, even registering at one point with the California Secretary of State and, albeit forfeited, is still subject to service here. By its own representations, Perspective has purposefully targeted its services to California residents and this factor supports Plaintiff.

For the same reasons, the second factor supports Plaintiff. There is no legitimate claim of burden to defend here when one makes the choice to act and

1    behave this way here.

2            As to factors three and four, litigating this case in Korea would directly

3    conflict with the sovereignty of the United States because a universal principle of

4    copyright law is that the scope of protection and actions for infringement are

5    governed by the laws of the country where protection is claimed. Berne Convention

6    for the Protection of Literary and Artistic Works art. 5, Sept. 28, 1979 ("Berne

7    Convention"). As such, the United States has a substantial interest in adjudicating

8    this matter, and California because the harm was substantially suffered in California.

9            As to factors five and six, the forum that guarantees the most efficient judicial

10   resolution of the controversy, that protects HIG's interests in the litigation and

11   assures an effective relief, is California. HIG is a California corporation located

12   within the State, the harm was suffered in California, and most of the material

13   witnesses and documents are located in California. Defendant Netflix is here too and

14   whatever indemnity claims it has against Zip/Perspective it will allege here too of

15   course. The burden on HIG of going to Korea is more than it can afford, having

16   already been damaged in this scheme. Jordan Decl. ¶ 10. Finally, there is no

17   alternative forum because actions for copyright infringement in the United States are

18   governed by U.S. laws. Therefore, Perspective has not presented a compelling case

19   as to why it is unreasonable to subject it to personal jurisdiction in California.

20            **4.      Perspective's Contacts Are Attributed to Zip**

21           The entire argument above about Perspective applies to Zip lock, stock and

22   barrel because both were co-partners on the same business contract for the same

23   film at issue here, which they then sent downstream to Netflix using Lotte as the

24   intermediary given its extant Netflix relationship. Courts across the country have

25   held that it is consistent with due process to attribute the contacts of one defendant

26   to another defendant when they have led the plaintiff "and the public to believe they

27   were joint venturers." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole,*

28   *P.A.*, 290 F.3d 42, 57 (1st Cir. 2002); *Bensmiller v. E.I. Dupont Nemours & Co.*, 47

19

F.3d 79, 81 (2d Cir. 1995) (recognizing that the forum contacts of one co-defendant can be attributed to the other under a joint venture theory); *Certain Underwriters at Lloyd's v. Garmin Int'l, Inc.*, No. 11-2426 EFM-GLR, 2012 WL 1158849, at *4 (D. Kan. Apr. 6, 2012) ("For personal jurisdiction purposes, a party is subject to estopped when it holds itself out as being in a joint venture, even if it is not a true joint venture."); *Hill v. Shell Oil Co.*, 149 F. Supp. 2d 416, 418 (N.D. Ill. 2001).

Here, both Zip and Perspective were joint venturers in the production of the infringing film. They jointly acquired rights through the agreement with Naylor to co-produce the infringing film for profit for both. Jin Decl. ¶ 3, Dkt. 78 7:18–23; Dkt. 32-2. This co-production and distribution relationship is a classic joint venture. *Boyd v. Bevilacqua*, 55 Cal. Rptr. 610, 619 (Cal. Ct. App. 1966) ("A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit."). Furthermore, they have led HIG, and the public in general, to believe that they were acting as joint venturers. For instance, on Zip Cinema's website, Zip promotes #*Alive* as a production between Zip and Perspective.[5] As such, all of Perspective's contacts with California further detailed *supra*, could—and should—be attributed to Zip for purposes of personal jurisdiction.

### ii.   Specific Personal Jurisdiction: Stream of Commerce.

Zip and Perspective are also subject to specific personal jurisdiction in California under the stream of commerce analysis. Zip and Perspective have placed an "English language" infringing version of the motion picture into the stream of commerce, expecting—indeed demanding—that it would enter the English-speaking United States (contra: it was not sent into the stream of commerce for non-English speaking countries), and there is a connection between HIG's harm, California, and Zip and Perspective delivering the film into the stream of commerce.

### 1. Defendants Placed the Work into Commerce.

In *Isbell*, the Northern District of Texas asserted specific personal jurisdiction

---

[5] Afrasiabi Decl. Ex. 8 (https://zipcine.modoo.at/?link=brqx22eh)

over an out-of-state defendant under a stream of commerce analysis. *Isbell*, 2004 WL 1243153, at *10. The court found that the defendant was subject to specific personal jurisdiction where the defendant improperly sold recordings in Texas pursuant to a distribution agreement and obtained sales income and royalties on each record sold. *Id.* The distribution agreement reflected the defendant's "expectation of, and financial interest in, having its recordings distributed throughout the United States, including in Texas." *Id.* The court found that the defendant "delivered its allegedly infringing recordings into the stream of commerce with the expectation that the work would make its way into Texas." *Id.* Therefore, subjecting the defendant to specific personal jurisdiction in Texas did not offend Due Process. *Id.*

Here, as in *Isbell*, Zip has placed an infringing motion picture into the stream of commerce. As Defendants point out, Zip "granted Lotte the right to exploit the Picture outside Korea and China." Dkt. 78 16:25–26. Zip claims that "Lotte—not Zip or Perspective—had the right to determine how and where the Picture would be distributed." *Id.* at 16:26–28. However, this is not true. Under the Zip-Lotte agreement, Zip granted Lotte ████████████████████████████ ████████████████████████████████████. Jin Decl., Ex. A Art. 8 § 1; Art. 3 § 1.D. Furthermore, under the terms of the agreement between Zip and Lotte, ████████ ████████████████████████████████████. Jin Decl., Ex. A Art. 5 § 1.C. This means that when Lotte subsequently licensed the film to Netflix, ████████████████████ ████████████████████████████████████ ██████████████████████████████ ██████████████████████████████ ████████████████. *See* Jin Decl., Ex. A; Kim Decl., Ex. B. In addition, starting on July 2020—well after having allegedly parted with its rights—Zip and Perspective initiated negotiation efforts with subterfuge through LA agents to try to

acquire sequel and other derivative rights of *Alone*. Jordan Decl. ¶ 6; Compl. ¶ 23. Despite the lack of success of these negotiations, Zip, Perspective, and Netflix released the dubbed and subtitled versions of *#Alive* anyway. *See* Compl. ¶¶ 26–28.

To be clear: **after** Zip had contracted with Lotte to get the Korean film delivered to the US market (and hence dubbed to English with new actors in the process pre-release), Zip raced to understand the timing of the Plaintiff's English release with its forum-directed activities discussed above. Thus, Zip was actively aiding Lotte-Netflix in the dub-and-release infringement scheme. Zip's contention to this Court that "we licensed to Lotte, and had no participation in how this was dubbed and released in the US" is false, betrayed by the actual record at the time. As such, there is no room for discussion that, by entering into the agreement with Lotte and thereafter collaborating in the overseas distribution of the infringing film, Zip has in fact placed the infringing film into the US/California stream of commerce.

Furthermore, Zip placed the infringing film into the stream of commerce specifically to allow the film to make its way, dubbed, into California. By entering into the agreement with Lotte and collaborating in the overseas distribution of the movie, Zip has specifically aided in the unauthorized preparation, reproduction, public display and exhibition, and distribution of the dubbed and subtitled film, knowing that it would be distributed worldwide by Netflix, including California. Zip knew that the film was en route to Netflix (in California) for release in the United States—that was the very purpose of the distribution deal with Lotte ████████ ████████. Jin Decl., Ex. A; Dkt. 30, Ex. F.  Therefore, taking the facts alleged in the Complaint as true, and based on the emails and Zip-Lotte agreement's date, it is the case that Zip has placed the infringing film into the stream of commerce, expecting that the film would directly and immediately make its way to California. As such, the first prong of the stream of commerce analysis is satisfied.

Zip cites to *Kellytoy Worldwide Inc. v. Jay at Play Int'l Hong Kong Ltd.*, No. 19-cv-07831, 2019 WL 8064196, at *6 (C.D. Cal. Dec. 5, 2019), to contend that

merely contracting with a party that does business in the State does not suffice. Dkt. 78 17:4–8. But *Kellytoy* declined personal jurisdiction over a foreign defendant, in part, because no facts indicated that the foreign defendant had any control over the distribution of the product at issue undertaken by a local company. This case is the opposite: Zip contracted to have it dubbed into English (an infringement) so that Netflix could stream releases it on the largest streaming platform in the world (more infringements). Zip then aided Netflix in the dub-and-release scheme to beat plaintiff to the market as outlined in detail § i above. And of course, California-earned royalties flowed back from Netflix to Zip/Perspective ultimately. This is the antithesis of *Kellytoy,* because the predicate of the contract was not a sale of some generic product to a forum agnostic buyer—it was a forum directed sale so the forum entity would deliver into that English-language forum an unlawful English dubbed work. It's stream of commerce on steroids.

Defendants cite *Bristol-Myers Squibb Co. v. Superior Ct. of California*, which held that "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." Dkt. 78 17:8–12 (citing *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1782 (2017)). True, but as explained above in great detail this case is decidedly not a mere "standing alone" fact pattern, and Zip/Perspective are decidedly not passive bird watchers.

### 2.  HIG's Harm, California, and the Film In the Stream of Commerce Are All Connected.

All roads lead to Rome, or, in this case, Hollywood. HIG is a corporation existing under the laws of California and with its principal place of business in California. The harm caused by the targeted infringement scheme includes harm to HIG's business reputation and goodwill, and decreased business and profits, all of which are suffered in California. This harm occurred because Zip placed the infringing film into the stream of commerce, expecting that it would make its way into California, specifically to California's Netflix, for delivery over streaming to

Californians, all the while helping Netflix beat HIG to the market by forum directed contacts. As such, there is a clear connection between HIG's harm, this forum, and Zip delivering the film into the stream of commerce.

### 3. Exercising Personal Jurisdiction Here is Reasonable.

For all the reasons detailed above, exercising personal jurisdiction is reasonable: Zip has intentionally placed the infringing movie into the stream of commerce, expecting that it would make its way into California. The laws of the United States apply to actions for copyright infringement. Berne Convention art. 5. California has a substantial interest in adjudicating this dispute because the harm has been suffered in California. The most efficient way to solve this dispute is in California because most material witnesses and documents are located here, prime Defendant Netflix is here, and it is in Plaintiff's interest to a convenient and speedy relief to have the case heard here. Furthermore, Korea would not be an adequate forum because U.S. law governs actions for copyright infringement. *Id.*

### 4. Zip's Contacts are Attributable to Perspective.

The entirety of the stream of commerce analysis for Zip above also applies to Perspective. While the agreement between Zip and Lotte does not mention Perspective, Zip's contacts with California under the stream of commerce analysis can—and should—be imputed to Perspective under the joint venture theory further explained in Section III.A.i.4 *supra*.

### B. Summary Conclusion

Defendants are movie producers who tell the world they are LA based. Defendants reached into this forum as part of their dub-and-release infringement scheme so as to learn Plaintiff's schedule for its movie release and streaming plans, all so that Defendants could steal the race to streaming service Netflix for a release of English language film to English language viewers here. Defendants did this claiming they were operating with agents in LA. Defendants then transferred their rights to Lotte, the party with a Netflix distribution deal—all to allow their Korean

film to be dubbed into English and released. In the midst of their scheme, they secured help of Matt Naylor, an LA resident, andanother an LA attorney, to try to get derivative rights. Plaintiff refused this entreaty too. And they then released the unlawful derivative work on streaming here. Defendant Perspective Pictures and its owner Ms. Kim even has a shadow "Perspective Pictures" company registered in California, where she has even failed to pay the State the requisite taxes and fees.

At best, Defendants have either lied to the world about their LA contacts or lied to this Court—neither justifies judicial solicitude, and when one chooses to advertise a presence, whether lie or not, one is bound to it. There is nothing remotely offensive to any notion of fair play to require one who transacts in this forum in this way, utilizing it for commercial advantage with LA agents as part of the scheme related to this case, to be asked to answer here.

## IV.   PLAINTIFF'S REQUEST FOR DISCOVERY.

The motion respectfully should be denied. But if the Court has any concerns, then Plaintiff seeks discovery. "Jurisdictional discovery 'should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852 (9th Cir. 2022).

## V.   CONCLUSION

Respectfully, the motion should be denied.

Dated: May 6, 2022

**ONE LLP**

By:  /s/ Peter Afrasiabi

Peter Afrasiabi, Esq.
John Tehranian, Esq.
**ONE LLP**

Maximillian Amster
Samuel J Salario Jr., Esq.
**BAY ADVOCACY PLLC**

Attorneys for Plaintiff,
Hollywood Innovations Group, LLC

25